# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS

|  |  |
|---|---|
| UNITEDHEALTHCARE BENEFITS OF TEXAS, INC., UHC OF CALIFORNIA, CARE IMPROVEMENT PLUS SOUTH CENTRAL INSURANCE COMPANY, PREFERRED CARE PARTNERS, INC., UNITEDHEALTHCARE COMMUNITY PLAN, INC., PEOPLES HEALTH, INC., and SIERRA HEALTH AND LIFE INSURANCE COMPANY, INC., <br><br> *Plaintiffs* <br><br> v. <br><br> CENTERS FOR MEDICARE & MEDICAID SERVICES and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> *Defendants* | Civil Action No. _____ |

# COMPLAINT

Plaintiffs are health insurance plans that bring this action to challenge an arbitrary and capricious, and otherwise unlawful, evaluation and rating of their performance by the federal agency that regulates them — Defendant Centers for Medicare & Medicaid Services ("CMS"). CMS evaluates the plans at issue through a ranking process it uses to assign Star Ratings that consumers rely upon to choose health insurance during annual enrollment periods (among other times). One of the measures that CMS uses to conduct such evaluations relates to the performance of a plan's customer service call center. CMS has downgraded Plaintiffs' Star Ratings based on an arbitrary and capricious assessment of how Plaintiffs' call center handled a single phone call that lasted less than ten minutes. Unless corrected by this Court, that downgrade will misinform millions of current and potential customers, deterring them from

choosing Plaintiffs' plans as their insurers for 2025.  The substantial adverse impact from CMS's defective evaluation is imminent, because the Star Ratings will be published for customer consideration on or about October 10, 2024, and the annual enrollment period for all Medicare beneficiaries will begin on October 15, 2024.  Plaintiffs respectfully request the Court's urgent intervention to implement the remedies set forth in this Complaint.

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction over this action under 42 U.S.C. §§ 1395ii and 405(g) or, in the alternative, under 28 U.S.C. § 1331, to provide remedies set forth in 5 U.S.C. § 706 and 28 U.S.C. § 2201.

2. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff UnitedHealthcare Benefits of Texas, Inc.'s principal place of business is in this District.

## PARTIES

3. Plaintiffs UnitedHealthcare Benefits of Texas, Inc., UHC of California, Care Improvement Plus South Central Insurance Company, Preferred Care Partners, Inc., UnitedHealthcare Community Plan, Inc., Peoples Health, Inc., and Sierra Health and Life Insurance Company, Inc. are health insurance plans that provide Medicare Advantage plans for their customers.  Plaintiffs' Medicare Advantage plan offerings are subject to the Star Ratings at issue in this case.

4. Defendant Centers for Medicare & Medicaid Services ("CMS") is an agency within Defendant U.S. Department of Health and Human Services.  CMS made the Star Ratings decision that is the final agency action challenged in this case.

## STATUTORY AND REGULATORY FRAMEWORK

### The Medicare Advantage Program

5. The Medicare program, authorized under Title XVIII of the Social Security Act, is a federal program that provides health insurance benefits for Americans aged 65 years and older and certain disabled persons. *See* 42 U.S.C. §§ 1395 *et seq*.

6. CMS is the federal agency responsible for administering the Medicare program.

7. Individuals enrolled in Medicare may elect to receive their benefits under either "Original Medicare" (i.e., Parts A and B) or under Part C of the Medicare program, commonly referred to as the "Medicare Advantage" program, as an alternative to Original Medicare.

8. Under Part C, CMS contracts with private insurance payors, commonly known as Medicare Advantage plans ("MA Plans"), to provide and arrange for Medicare-covered benefits for Medicare beneficiaries who enroll in their benefit plan. *See* 42 C.F.R. § 422.4.

9. MA Plans provide additional benefits beyond those covered by Original Medicare. MA Plans compete with Original Medicare and with one another to convince beneficiaries to select their plan.

### The Star Ratings Program

10. In an effort to encourage MA Plans to offer high quality plans and to assist Medicare beneficiaries in selecting an MA Plan, CMS studies and surveys MA Plans for quality, compliance, and other performance metrics to develop numerical ratings for each MA Plan known as "Star Ratings."

11. The Star Ratings are based on a five-star scale, set in half-star increments, with 1 star being the lowest rating and 5 stars being the highest. *See* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii).

12. The Star Ratings are designed to be "a true reflection of the plan's quality" and must be based on data that is "complete, accurate, reliable, and valid." 83 Fed. Reg. 16440, 16521 (Apr. 16, 2018).

13. Star Ratings information is widely available to Medicare beneficiaries to consider when choosing to enroll in an MA Plan. These measures are particularly important, as they allow beneficiaries to compare health plans based on how CMS considers the quality of the plan.

14. CMS prominently displays Star Ratings in its online and print resources on available MA Plans as required under the Social Security Act. *See* 42 U.S.C. § 1395w–21.

15. Through the online Medicare Plan Finder tool, CMS displays MA Plans to prospective members in highest to lowest Star Ratings order, with the express purpose of guiding beneficiaries to higher-rated plans first.

16. Medicare beneficiaries use the Star Ratings to assess the quality of the MA Plans available to them.

17. Thus, the Star Ratings have tremendous value to, and impact on, MA Plans to provide quality care and benefits to their members, compete in the marketplace, receive compensation, and even remain eligible to continue to participate in the Medicare Advantage program.

18. Star Ratings for MA Plans are based on a calculation of numerous performance measures designed to assess member services and care, including but not limited to preventative health services, management of long-term conditions, member experiences with the health plan, member complaints, and customer service. *See Medicare 2024 Part C & D Star Ratings Technical Notes* at 26-100, CENTERS FOR MEDICARE AND MEDICAID SERVICES,

https://www.cms.gov/files/document/2024technotes20230929.pdf.; *see also* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii).

### Medicare Plan Finder and the Annual Enrollment Period That Begins October 15

19. Every October, CMS publishes new Star Ratings for the upcoming calendar year, in advance of the Medicare Advantage annual, coordinated enrollment period (during which all Medicare enrollees can review their options and select plans for the upcoming plan year).

20. CMS publishes plan Star Ratings through the Medicare Plan Finder website and requires plans to make standardized Star Ratings information available to prospective enrollees. 42 C.F.R. § 422.2267(e)(13).

21. Updated Star Ratings must not be used until CMS releases Star Ratings on Medicare Plan Finder. 42 C.F.R. § 422.2267(e)(13)(v).  In addition, beneficiaries can enroll year-round in plans on contracts that are rated five stars.  42 C.F.R. § 422.62(b)(15).

22. CMS allows MA organizations to begin marketing prospective plan year offerings on October 1 of each year for the following contract year. 42 C.F.R. § 422.2263(a). By statute, the annual, coordinated election period for each plan year begins on October 15 and ends on December 7.  42 U.S.C. § 1395w–21(e)(3)(B)(v).  As described by CMS, during this period, "people with Medicare can change their Medicare health plans and prescription drug coverage for the following year to better meet their needs." https://www.cms.gov/priorities/key-initiatives/medicare-open-enrollment-partner-resources.  An additional annual enrollment period allows people who are already in an MA plan one opportunity to switch plans between January 1 and March 31.  42 C.F.R. § 422.62(a)(3)(i).  Special circumstances create other enrollment or switching opportunities throughout the year.  42 C.F.R. § 422.62(b).

**The Applicable Administrative Process**

23. CMS's regulations establish an administrative process through which an MA plan can review, and challenge the adequacy of, the agency's preliminary plan-quality evaluations which, if finalized, will adversely affect final Star Ratings. To protect plans against erroneous evaluations that could unfairly undermine their ability to compete for customers, CMS initiates and concludes this process before it finalizes the Star Ratings and publishes them on the Medicare Plan Finder. The regulations call this administrative process plan preview periods: "CMS will have plan preview periods before each Star Ratings release during which MA organizations can preview their Star Ratings data in HPMS prior to display on the Medicare Plan Finder." 42 C.F.R. § 422.166(h)(2). HPMS is CMS's Health Plan Management System, a website used to facilitate communications between CMS and plans. *See* https://hpms.cms.gov/app/ng/home/.

24. The plan preview process is the only administrative process available to a plan permitting it to challenge the Star Ratings before they are finalized and published.

25. CMS offers plans two plan preview periods. The first plan preview allows for review of the methodology and posted numeric data for each measure. This year, the first plan preview lasted from August 7-14, 2024. The second plan preview includes any revisions made as a result of the first plan preview and allows plans to review preliminary Star Ratings for each measure, domain, summary score, and overall score. This year, the second plan preview lasted from September 6-13, 2004. 83 Fed. Reg. 16440, 16588 (April 16, 2018); HPMS Memo, *First Plan Preview of 2025 Medicare parts C and D Star ratings Data*, Aug. 6, 2024; HPMS Memo, *Second Plan Preview of 2025 Medicare parts C and D Star ratings Data*, Sept. 5, 2024.

26. 2025 Star Ratings are scheduled to be released via the Medicare Plan Finder on or about October 10, 2024. *Id*.

## CMS's Evaluation of a Plan's Call Center
## Foreign Language Interpreter and TTY Availability

27. Each MA organization must have mechanisms for providing specific information on a timely basis to current and prospective enrollees upon request, including via a toll-free customer service call center. 42 C.F.R. § 422.111(h). Regulations specify that call centers must limit average hold time to no longer than 2 minutes, answer 80 percent of incoming calls within 30 seconds, and limit the disconnect rate of all incoming calls to no higher than 5 percent, among other specified requirements. *Id*.

28. Plan call centers must also provide interpreters for non-English speaking and limited English proficient (LEP) individuals. 42 C.F.R. § 422.111(h)(1)(iii). Specifically, regulations state that "interpreters must be available for 80 percent of incoming calls requiring an interpreter within 8 minutes of reaching the customer service representative and be made available at no cost to the caller." 42 C.F.R. § 422.111(h)(1)(iii)(B).

29. In addition to requiring plans to operate a call center, CMS assesses plan performance based on a Star Ratings measure focused on the call center. Specifically, Star Ratings reflect scores on a measure known as "D01 – Call Center – Foreign Language Interpreter and TTY Availability". Medicare 2024 Part C & D Star Ratings Technical Notes, 3/13/2024, https://www.cms.gov/files/document/2024-star-ratings-technical-notes.pdf.

30. CMS evaluates a plan's performance under this measure by placing anonymous test calls to plan call centers. The test calling process is known as a "study." *See* July 11, 2024 HPMS memo, "2024 Call Center Monitoring Performance Metrics for Accuracy and

7

Accessibility Study". The test calls are the agency's sole source of information about the plan's performance under this measure.

31. The foregoing measure determines the "[p]ercent of time that TTY services and foreign language interpretation were available when needed by people who called the health plan's prospective enrollee customer service phone line." Medicare 2024 Part C & D Star Ratings Technical Notes, 3/13/2024, https://www.cms.gov/files/document/2024-star-ratings-technical-notes.pdf.*Id*.

32. Scoring of this measure for purposes of foreign language interpreter availability is based on "the number of completed contacts with the interpreter . . . divided by the number of attempted contacts. Completed contact with an interpreter is defined as establishing contact with an interpreter and confirming that the customer service representative can answer questions about the plan's Medicare Part C benefit within eight minutes." *Id*.

33. CMS guidance also establishes additional, more specific, rules governing the agency's evaluation (through its test calls) of whether calls have been "connected" and "completed." "A call is considered **connected** when the caller confirms that the call connects to the CSR. The measure is considered **completed** when contact has been established with an interpreter and the introductory question has been correctly answered within eight minutes of reaching a CSR." Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes, 11.

34. CMS has a practice of excluding certain calls altogether from this ratio of completed to attempted contacts.  CMS refers to this exclusion as "invalidating" a call, and sometimes this is done during the Plan Preview process.  CMS has a practice of invalidating calls, among other reasons, when there is no evidence that the plan was at fault for a call that was

not successfully connected or completed.  Accordingly, in pertinent part, CMS's study places a call into one of three categories:  (1) successfully completed; (2) not successfully completed (after having been connected); or (3) invalidated (i.e., excluded from the study and not considered for purposes of Star Ratings).

35. The agency's test callers must follow certain procedures before they may conclude that a call center has "completed" a call for assessment.  First, the CMS test caller must dial the plan number. Second, the test caller must connect with the plan's customer service representative.  Third, the CMS test caller must ask an introductory question, to which the customer service representative must answer affirmatively. Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes, 5.

36. CMS guidance explains: "[i]f we are testing interpreter availability, we place the call in a foreign language and wait for the [customer service representative] to bring an interpreter to the phone to assist the [customer service representative] in answering our introductory question. We permit eight minutes for the [customer service representative] to connect to an interpreter and answer our introductory question. Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes, 6.

37. These prerequisites are designed to assure that the call center is fairly evaluated according to its own actions and inactions (and not charged with responsibility for call problems that were not its fault).

38. Simply meeting the regulatory requirement that interpreters be available for 80 percent of incoming calls within 8 minutes is not enough to receive a high score on the call center Star Rating measure. In order for a plan to receive 5 Stars on the call center measure in

9

2025, CMS requires 100 percent of foreign language calls included in the sample to be scored as successful.

39. Because 100% success is required to be awarded 5 Stars on the call center measure, CMS's decisions regarding whether and how to score each call included in the study can have a material impact on plan performance on the call center measure specifically, as well as on a plan's overall Star Rating.

## FACTS

### The Disputed Call

40. The Plaintiff MA plans share a single, state-of-the-art Call Center operated by their affiliated company, United HealthCare Services, Inc. ("United"). In this case, Plaintiffs' Star Rating for the "D01 – Call Center – Foreign Language Interpreter and TTY Availability" measure — as well as Plaintiffs' overall Star Ratings — turn on a single disputed call. That call is denominated by the identifier D0800225.

41. During the call in question, the CMS test caller was routed to a French-speaking United customer service representative. The CMS test caller connected to the representative, heard a voice, and said hello. On the call recording, faint rustling, and breathing sounds from the test caller side of the connection can be heard at several points. The call stayed connected for more than eight minutes, and the CMS test caller was never put on hold. At no point did the CMS test caller ask the required introductory question. For this reason, the customer service representative did not have the opportunity to provide a response. The United customer service representative disconnected the call after not being presented the introductory question within eight minutes of connecting to the interviewer.

42. There is no evidence in the record before CMS demonstrating that CMS asked the introductory question that was a prerequisite to any negative evaluation of the Call Center's response to the call. Accordingly, there was no evidence in the record supporting the conclusion that the call should be counted against the Plaintiffs.

### Plaintiffs' Exhaustion of the Plan Preview Process

43. As noted above, CMS has established an administrative process that consists of two Plan Preview Periods. Plaintiffs exhausted both parts of that process to raise its concerns regarding D0800225 with CMS. On July 19, 2024, Plaintiffs' affiliated company that operates their Call Center (i.e., United) contacted CMS on Plaintiffs' behalf, to raise concerns that the agency had erred in categorizing three calls, including D0800225, as "failures" in the test-call study. United requested that these calls be invalidated from the study.

44. During the remainder of the First Plan Preview Period, CMS and United exchanged communications related to the evidence relating to these calls. During the course of those communications, CMS invalidated one of the three calls.

45. On August 14, 2024, CMS issued its final decision for the First Plan Preview Period. That decision reaffirmed its prior decision as to the two remaining calls under dispute.

46. On September 13, 2024, as part of the Second Plan Preview Period, United communicated again with CMS, presenting evidence and argument that the agency should invalidate the two remaining calls. On September 16, 2024, CMS replied that it had completed its review and found that one of the calls would be invalidated, but that call D0800225 would remain in the sample.

47. On September 19, 2024, United responded to CMS, indicating that "the call log's characterization of D0800225 shows a misunderstanding of what actually occurred." United's

submission to the agency emphasized three major points: (1) that there was no evidence that the test caller fulfilled the requirements to include the call in the survey (because there was no evidence that the test caller asked the introductory question that was a prerequisite to including the call); (2) that the Call Center's eventual disconnection of the call was not relevant, because the disconnection occurred only after the Call Center had waited the required interval (eight minutes) during which time the test caller had not satisfied its obligation to ask the introductory question; and (3) that failure to invalidate the call would improperly subject the United plans to a different standard than those of the insurer Elevance, for which CMS had recently invalidated a call under similar circumstances.

48. On September 24, 2024, after the conclusion of the Second Plan Preview Period, CMS informed Plaintiffs (through United) that the agency had rejected the challenge to the single remaining disputed call. Accordingly, the agency has made its final decision about the disputed call. That final decision did not even address any of the three arguments raised by United in its September 19 submission.

49. CMS's decision to reject that final challenge will be imminently and automatically manifested in a Star Ratings decision for the affected plans that includes a 4 Star Rating on this call center measure, rather than a 5 Star Rating. For a number of the Plaintiffs' plans, the 4 Star Rating on this measure will lower the plan's overall Star Rating.

50. CMS will publish those overall Star Ratings on or about October 10, 2024 to guide beneficiaries' plan choices during the open enrollment period that begins October 15, 2024 and during enrollment throughout 2025.

**Final Agency Action**

51.     CMS's Star Ratings decision, which includes the agency's final decision about the disputed call, is a final agency action within the meaning of 5 U.S.C. § 704.

52.     CMS's Star Ratings decision is an agency action within the meaning of 5 U.S.C. §§ 551(6) and (13), because it is an "order" constituting an agency's final disposition in a matter other than rule making.

53.     CMS's Star Ratings decision is a final agency action, because it has determined Plaintiffs' legal rights and obligations and has otherwise triggered legal consequences for Plaintiffs.  Star Ratings have a concrete legal effect on MA Plans.  For example, CMS may terminate a plan's MA contract that has failed to achieve a Part C summary rating of at least three stars for three consecutive contract years. 42 C.F.R. § 422.510(a)(4)(xi).  In addition, while plans are typically barred from allowing Medicare beneficiaries to switch to their plan until the annual enrollment period, regulations permit a such a switch at any time during the year if the plan has a 5-Star Rating.  42 C.F.R. § 422.62(b)(15).

54.     CMS's Star Ratings decision is a final agency action, because it is the consummation of the agency's administrative Plan Preview process that is the last opportunity for plans to challenge Star Ratings before they are publicly announced for consideration by current and potential customers during 2025 enrollment.

55.     CMS's Star Ratings decision has triggered a substantial likelihood of imminent, concrete, particularized, direct, and substantial harm to Plaintiffs.  When the annual enrollment period begins on October 15, 2024 (following publication of Plaintiffs' Star Ratings in Medicare Plan Finder) the Star Ratings will deter current and potential customers from enrolling in their MA Plans for the 2025 plan year.  Every day of the annual enrollment period (October 15

through December 7), and every day of the open enrollment period (in January through March, 2025), and every other day in 2025 when a Medicare beneficiary has the option to choose of the impacted MA plans, the effect of Star Ratings being lower than they should be compounds. On information and belief, the collective harm to Plaintiffs from lost potential and actual customers will be millions of dollars unless this Court intervenes.

## CLAIMS FOR RELIEF

### COUNT I
### (Failure to Make Reasoned Decision/Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2)(A))

56. Plaintiffs reallege the allegations set forth in Paragraphs 1 through 55 of this Complaint as though fully set forth herein.

57. As explained more fully above, on September 19, 2024, in its final submission to CMS before the Star Ratings decision, United raised three major arguments: (1) that there was no evidence that the test caller fulfilled the requirements to include the call in the survey; (2) that the Call Center's eventual disconnection of the call was not relevant; and (3) that failure to invalidate the call would subject the United plans to disparate treatment as compared to other plans.

58. CMS's September 24, 2024 final decision concerning the disputed call did not even address any of the three arguments raised by United in its September 19 submission. Accordingly, the agency did not make a reasoned decision about the disputed call.

59. CMS's failure to make a reasoned decision about the disputed call rendered the Star Ratings decision an arbitrary and capricious final agency action within the meaning of 5 U.S.C. § 706(2)(A).

## COUNT II
**(Disparate Treatment/Arbitrary and Capricious Agency Action  (5 U.S.C. § 706(2)(A))**

60. Plaintiffs reallege the allegations set forth in Paragraphs 1 through 59 of this Complaint as though fully set forth herein.

61. As explained above, there is no evidence in the record before CMS demonstrating that CMS asked the introductory question that was a prerequisite to any negative evaluation of the Call Center's response to the call.  Accordingly, there was no evidence in the record supporting the conclusion that the call should be counted against the Plaintiffs.

62. In its Star Ratings decision, CMS downgraded Plaintiffs' overall Star Ratings based upon a single call—the disputed call—without evidence that it should be counted against them.  In downgrading Plaintiffs' overall Star Ratings based upon a single disputed call without such evidence, CMS treated Plaintiffs fundamentally differently than other similarly-situated health plans, without any rational basis for the distinction.

63. Specifically, in 2023, the health insurer Elevance Health, Inc. (and 24 affiliated health plans, all of which used the same call center) challenged a CMS determination evaluating them under the same criterion at issue for Plaintiffs in this case:  measure "D01 – Call Center – Foreign Language Interpreter and TTY."  CMS concluded that their call center had missed a single call, and on that basis gave the plans a 4-star (as opposed to a 5-star) rating for that measure.  For four of the plans, the lower rating for that specific measure in and of itself reduced their overall Star Ratings below 4 stars.

64. CMS ultimately resolved the dispute in Elevance's favor, because there was no evidence supporting the conclusion that the call should be counted against the Elevance plans.  Elevance described the final CMS determination as follows:  "Based on the evidence presented by Elevance and CMS, the CMS Reconsideration Official found that there was no evidence the

call at issue failed due to actions by Elevance and should not have counted against Elevance. The CMS Reconsideration Official concluded that Elevance should have received a 100% success rate for measure D01, meriting a 5-Star rating on that measure."

65. Plaintiffs and the Elevance health plans are similarly situated, and there is no principled distinction between Plaintiffs' single-call dispute and Elevance's single-call dispute. Nevertheless, CMS ruled against Plaintiffs and in favor of Elevance based upon problematic calls when there was no evidence supporting the conclusion that the calls should be counted against them. CMS's disparate treatment of Plaintiffs as compared to the Elevance health plans has no rational basis. Because it is grounded in that disparate treatment, the Star Ratings decision is an arbitrary and capricious final agency action within the meaning of 5 U.S.C. § 706(2)(A).

## COUNT III
**(Decision Not Supported by Substantial Evidence/Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2)(A))**

66. Plaintiffs reallege the allegations set forth in Paragraphs 1 through 65 of this Complaint as though fully set forth herein.

67. As explained above, there is no evidence in the record before CMS demonstrating that CMS asked the introductory question that was a prerequisite to any negative evaluation of the Call Center's response to the call. Accordingly, there was no evidence in the record supporting the conclusion that the call should be counted against the Plaintiffs.

68. Because it is not supported by substantial evidence, the Star Ratings decision is an arbitrary and capricious final agency action within the meaning of 5 U.S.C. § 706(2)(A).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.      Issue a declaratory judgment holding that CMS's decision to include the disputed call (D0800225) in the 2024 Call Center Monitoring Performance Metrics for Accuracy and Accessibility Study is unlawful;

B.      Issue an injunction requiring CMS to recalculate forthwith Plaintiffs' 2025 Star Ratings without considering the disputed call (and immediately publish the recalculated Star Ratings in the Medicare Plan Finder);

C.      In the alternative, hold that Plaintiffs' Star Ratings decision is unlawful and remand the matter to CMS to recalculate forthwith Plaintiffs' 2025 Star Ratings without considering the disputed call (and immediately publish the recalculated Star Ratings in the Medicare Plan Finder); and

D.      Grant Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Jared M. Slade*
Texas State Bar No. 24060618
Jared.slade@alston.com
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, Texas 75201
Telephone: 214-922-3400
Facsimile: 214-922-3899

/s/ *Daniel G. Jarcho*
Daniel G. Jarcho (D.C. Bar #391837)*
Kelley C. Barnaby (D.C. Bar #998757)*
Christopher J. Frisina (D.C. Bar #1033185)*
daniel.jarcho@alston.com
kelley.barnaby@alston.com
christopher.frisina@alston.com
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC  20004
Telephone: (202) 239-3300
Facsimile: (202) 239-3333

\* *pro hac vice* motions forthcoming

COUNSEL FOR PLAINTIFFS