**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| UNITEDHEALTHCARE BENEFITS OF TEXAS, INC., et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> CENTERS FOR MEDICARE & MEDICAID SERVICES, et al., <br><br> *Defendants.* | Civil Action No. 6:24-cv-00357-JDK |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT THEREOF[1]**

Daniel G. Jarcho (D.C. Bar #391837)
Kelley C. Barnaby (D.C. Bar #998757)
Christopher J. Frisina (D.C. Bar #1033185)
daniel.jarcho@alston.com
kelley.barnaby@alston.com
christopher.frisina@alston.com
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC  20004
Telephone: (202) 239-3300
Facsimile: (202) 239-3333

Jared M. Slade
Texas State Bar No. 24060618
jared.slade@alston.com
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, Texas 75201
Telephone: 214-922-3400
Facsimile: 214-922-3899

*Attorneys for Plaintiffs*

---

[1] The Court has granted permission to file under seal.

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF ISSUES ................................................................................ 2

STATUTORY AND REGULATORY BACKGROUND.................................... 2

    A.    The Medicare Advantage Program ............................................ 2

    B.    The Star Ratings Program ........................................................ 3

    C.    Medicare Plan Finder and the Annual Enrollment Period That Begins October 15 ................................................................... 4

    D.    The Applicable Administrative Process..................................... 5

    E.    CMS's Evaluation of Foreign-Language Interpreter Services at a Plan's Customer-Service Call Center ....................................... 6

    F.    CMS's Criteria for Determining Whether a Call is Successfully Completed, Not Successfully Completed, or Invalidated......................... 7

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................... 10

    A.    The Disputed Call .................................................................. 10

    B.    Plaintiffs' Exhaustion of the Plan Preview Process................... 11

    C.    The Star Ratings Decision and Its Impact................................ 11

ARGUMENT .................................................................................................. 13

    I.    CMS'S STAR RATINGS DECISION IS ARBITRARY AND CAPRICIOUS................................................................................ 13

        A.    CMS Violated its Own Decision-Making Criteria When It Included the Disputed Call in the Study ................................ 13

        B.    CMS's Star Ratings Decision Was Arbitrary and Capricious Because It Treated Plaintiffs Differently Than Other Similarly Situated Plans Without a Rational Basis for the Distinction .................... 15

        C.    CMS's Star Ratings Decision Was Arbitrary and Capricious Because It Utterly Failed to Address United's Major Objections ........... 18

            1.    CMS Ignored Plaintiffs' Argument That There Was No Evidence That the Test Caller Fulfilled the Requirements to Include the Call in the Study........................ 19

            2.    CMS Ignored Plaintiffs' Disparate Treatment Objection ............. 20

            3.    CMS Ignored Plaintiffs' Argument That the Disconnection of the Call was Irrelevant...................................... 21

4.    The Limited Rationale That CMS Did Provide Derived
From an Impermissible Delegation of the Agency's
Decision-Making Authority to a Private-Party Contractor
With a Conflict of Interest ............................................................. 22

5.    The Court Must Evaluate CMS's Decision Based Upon its
Stated Rationale, Not a Post-Hoc Rationalization ........................ 24

CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ................................................................................10

*Amin v. Mayorkas*,
    24 F.4th 383 (5th Cir. 2022) ..............................................................................14, 20

*Ass'n of Private Sector Colleges and Universities v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) ................................................................................18

*BNP Paribas Energy Trading GP v. FERC*,
    743 F.3d 264 (D.C. Cir. 2014) ................................................................................18

*BNSF Ry. Co. v. Fed. R.R. Admin.*,
    62 F.4th 905 (5th Cir. 2023) ...................................................................................19

*Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*,
    403 F.3d 771 (D.C. Cir. 2005) ................................................................................18

*Calumet Shreveport Refin., L.L.C. v. EPA*,
    86 F.4th 1121 (5th Cir. 2023) .................................................................................24

*Consumers' Rsch. Cause Based Commerce, Inc. v. FCC*,
    109 F.4th 743,770 (5th Cir. 2024) ..........................................................................22

*D&F Afonso Realty Trust v. Garvey*,
    216 F.3d 1191 (D.C. Cir. 2000) ..............................................................................21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ....................................................................................................13

*Elevance Health, Inc. v. Becerra*,
    No. 1:23-cv-03902-RDM (D.D.C. Dec. 29, 2023), Dkt. No. 1 ........................15, 16

*Environmentel, LLC v. FCC*,
    661 F.3d 80 (D.C. Cir. 2011) ..................................................................................13

*Fla. Power & Light Co. v. FERC*,
    85 F.3d 684 (D.C. Cir. 1996) ..................................................................................25

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018) ..........................................................................14, 20

*Healthy Gulf v. FERC*,
    107 F.4th 1033 (D.C. Cir. 2024) .............................................................................20

iii

*In re Bell Petroleum Servs.*,
    3 F.3d 889 (5th Cir. 1993) ...................................................................................24

*La. Pub. Serv. Comm'n v. FERC*,
    761 F.3d 540 (5th Cir. 2014) ..........................................................................22, 23

*Lakeland Bus Lines, Inc. v. NLRB*,
    347 F.3d 955 (D.C. Cir. 2003) ..............................................................................20

*Lemoyne-Owen Coll. v. NLRB*,
    357 F.3d 55 (D.C. Cir. 2004) ................................................................................20

*LePage's 2000, Inc. v. Postal Regulatory Comm'n*,
    642 F.3d 225 (D.C. Cir. 2011) .........................................................................18, 21

*Liliputian Systems, Inc. v. Pipeline and Hazardous Materials Safety Administration*,
    741 F.3d 1309 (D.C. Cir. 2014) .............................................................................18

*Marshall County Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) .............................................................................10

*Medicare Open Enrollment*,
    CENTERS FOR MEDICARE AND MEDICAID SERVICES,
    https://www.cms.gov/priorities/key-initiatives/medicare-open-enrollment-partner-
    resources ..................................................................................................................4

*Medina Cnty. Envt'l Action Ass'n v. Surface Transp. Bd.*,
    602 F.3d 687 (5th Cir. 2010) .................................................................................10

*Michigan v. EPA*,
    576 U.S. 743 (2015) ...............................................................................................24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*.
    463 U.S. 29 (1983) .................................................................................................18

*PDK Laboratories, Inc. v. DEA*,
    362 F.3d 786 (D.C. Cir. 2004) ...............................................................................24

*Prairie Band Potawatomi Nation v. Yellen*,
    63 F.4th 42 (D.C. Cir. 2023) ..................................................................................18

*Rempfer v. Sharfstein*,
    583 F.3d 860 (D.C. Cir. 2009) ...............................................................................10

*Republic Airline, Inc. v. U.S. Dep't of Transportation*,
    669 F.3d 296 (D.C. Cir. 2012) ...............................................................................21

*Seaquist v. Blakey*,
    210 F. App'x. 423 (5th Cir. 2006) .........................................................14

*SeaWorld of Florida, L.L.C. v. Perez*,
    748 F.3d 1202 (D.C. Cir. 2014) (Kavanaugh, J., dissenting) .................................15

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943).........................................................24

*Select Specialty Hospital - Bloomington, Inc. v. Burwell*,
    757 F.3d 308 (D.C. Cir. 2014).........................................................24

*Sierra Club v. Lynn*,
    502 F.2d 43 (5th Cir. 1974) .........................................................22

*Sierra Club v. Sigler*,
    695 F.2d 957 (5th Cir. 1983) .........................................................24

*Sinclair Wyoming Refining Co. LLC v. EPA*,
    No. 22-1073, 2024 U.S. App. LEXIS 20424 (D.C. Cir. Aug. 14, 2024)................................15

*Spirit Airlines, Inc. v. United States*,
    997 F.3d 1247 (D.C. Cir. 2021) .........................................................25

*Tex. Office of Pub. Util. Counsel v. FCC*,
    265 F.3d 313 (5th Cir. 2001) .........................................................22

*Texas v. Rettig*,
    987 F.3d 518 (5th Cir. 2021) .........................................................22

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) .........................................................18

*Town of Barnstable v. FAA*,
    659 F.3d 28 (D.C. Cir. 2011).........................................................13

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.*,
    985 F.3d 472 (5th Cir. 2021) .........................................................15, 17

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951).........................................................20

*Wages & White Lion Invs., L.L.C. v. FDA*,
    90 F.4th 357 (5th Cir. 2024) .........................................................25

## STATUTES

5 U.S.C. § 706(2)(A).........................................................2, 13

42 U.S.C. §§ 1395 *et seq*......................................................................................................2

42 U.S.C. § 1395w–21 ..........................................................................................................4

42 U.S.C. § 1395w–21(e)(3)(B)(v) .......................................................................................3

42 U.S.C. § 1395w–23(a)(1)(A) ..........................................................................................12

42 U.S.C. § 1395w–23(o)(4)..................................................................................................3

Administrative Procedure Act.....................................................................................10, 13, 20

**FILED UNDER SEAL**

Plaintiffs respectfully move the Court for summary judgment on all Counts in the Complaint. After Plaintiffs discussed with Defendants the substantial harm Plaintiffs and countless Medicare beneficiaries will suffer absent prompt judicial resolution of this dispute, the parties jointly moved for an expedited briefing schedule. Plaintiffs now respectfully ask this Court to rule by November 30, 2024, on this motion and Defendants' forthcoming cross-motion.

## **INTRODUCTION**[2]

Plaintiffs are health insurance companies challenging an arbitrary and capricious evaluation and rating of their performance by the federal agency that regulates them — Defendant Centers for Medicare & Medicaid Services ("CMS"). CMS has improperly downgraded CMS's quality ratings of Plaintiffs' Medicare Advantage plans that Medicare beneficiaries use to make enrollment decisions. Starting today, despite Plaintiffs identifying the error to CMS on multiple occasions, millions of enrollees and potential enrollees are being provided inaccurate ratings information for Plaintiffs, which will significantly impact Plaintiffs' enrollment rates.

CMS evaluates the Medicare Advantage plans at issue through a ranking process it uses to assign numerical ratings called "Star Ratings." One of the Star Ratings measures concerns the performance of a plan's customer service call center for prospective customers. Here, CMS downgraded Plaintiffs' Star Ratings based on the assessment of Plaintiffs' handling of a single phone call. That assessment is arbitrary and capricious, violated the agency's own procedures, and treated Plaintiffs differently than other similarly situated health plans. In particular, CMS wrongly decided that a single phone call testing plans' foreign-language interpreter services was "not successfully completed," even though by CMS's own rules it should have "invalidated" the

---

[2] Excerpts of the cited portions of the Administrative Record are attached at Ex. A. Plaintiffs will provide the native files cited in the Administrative Record to the Court on a flash drive.

call (i.e., removed it from the sample) because the CMS test caller indisputably did not ask the required "introductory question."  That blatant error, if uncorrected, will have a drastic impact on enrollment in Plaintiffs' plans for 2025.

Plaintiffs moved for expedited summary judgement to prevent significant damage from CMS's unlawful action.  Millions of Medicare beneficiaries will rely on these wrongfully lower ratings in making enrollment decisions for 2025.  Plaintiffs are suffering, and will continue to suffer, substantial losses if the current Star Ratings remain in effect, as current and future customers enroll with other plans.  Indeed, the adverse impact from CMS's defective evaluation has already begun, because the Star Ratings were published for customer consideration on October 10, 2024, and the annual enrollment period for all Medicare beneficiaries begins today—on October 15, 2024.

Plaintiffs respectfully request the Court's urgent intervention to enter summary judgment and issue a permanent injunction correcting this wrongful agency action.

## STATEMENT OF ISSUES

Whether CMS's determination regarding the disputed call, and thus the Star Ratings decision that derived from that determination, was arbitrary and capricious under 5 U.S.C. § 706(2)(A).

## STATUTORY AND REGULATORY BACKGROUND

### A.    The Medicare Advantage Program

CMS administers the federal Medicare program, which provides health insurance benefits for Americans aged 65 years and older and certain disabled persons. *See* 42 U.S.C. §§ 1395 *et seq*. Medicare beneficiaries may elect to receive their benefits under "Original Medicare" (called Medicare Parts A and B), through which the government pays directly for benefits.  Alternatively, Medicare beneficiaries may enroll in the "Medicare Advantage" program (called Medicare Part

C).  Under Part C, CMS contracts with private health insurance payors—commonly known as Medicare Advantage ("MA") plans—that pay for their enrolled beneficiaries' Medicare-covered benefits.  *See* 42 C.F.R. § 422.4.[3]  MA plans provide at least the same benefits as Original Medicare and often also offer additional benefits.  MA plans thus compete with Original Medicare—and with one another—to convince beneficiaries to select their plans.

### B.    The Star Ratings Program

CMS studies and surveys MA plans for quality, compliance, and other performance metrics to calculate Star Ratings for each plan.  The Star Ratings are based on a five-star scale, set in half-star increments, with 1 star being the lowest rating and 5 stars being the highest.  *See* 42 U.S.C. § 1395w–23(o)(4); 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii).

The Star Ratings are designed to be "a true reflection of the plan's quality" and must be based on data that is "complete, accurate, reliable, and valid." 83 Fed. Reg. 16440, 16521 (Apr. 16, 2018).  In determining Star Ratings, CMS calculates dozens of different performance measures designed to assess member services and care.  These measures include, among other things, preventive health services, management of long-term conditions, member experiences with the health plan, member complaints, and customer service.  *See Medicare 2024 Part C & D Star Ratings Technical Notes* at 26-100, CENTERS FOR MEDICARE AND MEDICAID SERVICES, https://www.cms.gov/files/document/2024technotes20230929.pdf.;  *see also* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii).

Every October, CMS publishes new Star Ratings for the upcoming calendar year, in advance of the MA annual enrollment period that begins on October 15 and ends on December 7.

---

[3] The term "plan" is used to refer both to the entity that is the payor and to that payor's insurance offering.

*See* 42 U.S.C. § 1395w–21(e)(3)(B)(v).  During this period, "people with Medicare can change their Medicare health plans and prescription drug coverage for the following year to better meet their needs." *Medicare Open Enrollment*, CENTERS FOR MEDICARE AND MEDICAID SERVICES, https://www.cms.gov/priorities/key-initiatives/medicare-open-enrollment-partner-resources.

Although most enrollment decisions are made during this annual enrollment period, there is also an additional open enrollment period from January 1 through March 31, during which people already enrolled in MA plans have one opportunity to switch plans.  42 C.F.R. § 422.62(a)(3)(i).  In addition, special circumstances create other enrollment or switching opportunities throughout the year.  42 C.F.R. § 422.62(b).  For example, a Medicare enrollee may switch into a plan that has a 5-Star Rating at any time during the year. *Id*. § 422.62(b)(15).

### C.    Medicare Plan Finder and the Annual Enrollment Period That Begins October 15

Star Ratings are widely available to Medicare beneficiaries to review and consider when choosing to enroll in an MA plan.  CMS is required by statute to display Star Ratings prominently in online and print resources. *See* 42 U.S.C. § 1395w–21.

One of the most significant sources of information for beneficiaries is Medicare Plan Finder—an online tool that allows beneficiaries to comparison-shop among plans.  CMS publishes plan Star Ratings through the Medicare Plan Finder website and requires plans to make standardized Star Ratings information available to prospective enrollees.  42 C.F.R. § 422.2267(e)(13).  Medicare Plan Finder displays plans in highest-to-lowest order of Star Ratings, with the express purpose of guiding beneficiaries to higher-rated plans.  *See* https://www.medicare.gov/plan-compare/.

Marketing of MA plans for the following year is directly tied to the October release of the new Star Ratings in Medicare Plan Finder.  MA plans can begin marketing on October 1 but cannot

use Star Ratings in marketing materials until CMS releases the ratings on Medicare Plan Finder. 42 C.F.R. §§ 422.2263(a), § 422.2267(e)(13)(v).  Once that occurs, Star Ratings are an important guide for beneficiaries as they shop for plans, particularly because it is CMS—not a private party— that has evaluated plan quality following prescribed rules and policies.

### D.    The Applicable Administrative Process

CMS's regulations establish an administrative process through which an MA plan can challenge the agency's preliminary plan-quality evaluations.  To protect plans against erroneous evaluations that could unfairly undermine their ability to compete for customers, CMS initiates and concludes this process before it finalizes the Star Ratings and publishes them on Medicare Plan Finder.  This administrative process is called the "plan preview" process.[4]  The plan preview process is the only administrative process through which a plan may challenge Star Ratings before they are finalized and published.

The first of two plan previews (conducted in 2024 from August 7-14) allowed for review of the methodology and posted numeric data for each measure. The second plan preview (conducted in 2024 from September 6-13) allowed plans to review preliminary Star Ratings for each measure, domain, summary score, and overall score. 83 Fed. Reg. 16440, 16588 (Apr. 16, 2018); HPMS Memo, *First Plan Preview of 2025 Medicare parts C and D Star ratings Data*, Aug. 6, 2024; HPMS Memo, *Second Plan Preview of 2025 Medicare parts C and D Star ratings Data*, Sept. 5, 2024.

---

[4] The regulations state:  "CMS will have plan preview periods before each Star Ratings release during which MA organizations can preview their Star Ratings data in HPMS prior to display on the Medicare Plan Finder." 42 C.F.R. § 422.166(h)(2). HPMS is CMS's Health Plan Management System, a website used to facilitate communications between CMS and plans.  *See* https://hpms.cms.gov/app/ng/home/.

On October 10, 2024, CMS released the 2025 Star Ratings via the Medicare Plan Finder and the CMS website. *See* https://www.cms.gov/newsroom/fact-sheets/2024-medicare-advantage-and-part-d-star-ratings.

### E.    CMS's Evaluation of Foreign-Language Interpreter Services at a Plan's Customer-Service Call Center

Each MA plan must have mechanisms for providing specific information on a timely basis to current and prospective enrollees upon request, including through a toll-free customer-service call center. 42 C.F.R. § 422.111(h).  Among other things, plan call centers must provide interpreters for individuals who do not speak English or have limited English proficiency.  CMS rules require that "interpreters must be available for 80 percent of incoming calls requiring an interpreter within 8 minutes of reaching the customer service representative and be made available at no cost to the caller." 42 C.F.R. § 422.111(h)(1)(iii)(B).

One of CMS's performance measures specifically assesses this foreign-language interpreter service.[5]  CMS evaluates a plan's performance by placing anonymous test calls to customer call centers.  The test-calling process is known as a "study."  *See* HPMS memo, "2024 Call Center Monitoring Performance Metrics for Accuracy and Accessibility Study" (July 11, 2024).  Test calls are the agency's sole source of information about the plan's performance under this measure.

Through its test calls, CMS evaluates the "[p]ercent of time that . . . foreign language interpretation [was] available when needed by people who called the health plan's prospective

---

[5] The measure is known as "D01 – Call Center – Foreign Language Interpreter and TTY Availability".  Medicare 2024 Part C & D Star Ratings Technical Notes, 3/13/2024, https://www.cms.gov/files/document/2024-star-ratings-technical-notes.pdf, at 83.  TTY stands for text telephone, which is a device that allows a person with a hearing or speech disability to use a telephone.  TTY services are not at issue in this case.

enrollee customer service phone line." Medicare 2024 Part C & D Star Ratings Technical Notes, at 83 (Mar. 13, 2024), https://www.cms.gov/files/document/2024-star-ratings-technical-notes.pdf. CMS determines interpreter availability based upon on a ratio: "the number of completed contacts with the interpreter . . . divided by the number of attempted contacts." *Id.*

CMS excludes certain calls altogether from this ratio of completed-to-attempted contacts. CMS refers to this exclusion as "invalidating" a call from the study. (*See* AR 75, 168.)  When evaluating interpreter availability, CMS ultimately places a call into one of three categories: (1) successfully completed; (2) not successfully completed; or (3) invalidated (i.e., excluded from the ratio and not considered for purposes of Star Ratings).

For a plan to receive 5 Stars on the call center measure for 2025, CMS requires that 100 percent of foreign language calls included in the study sample be scored as successfully "completed."[6]  Because 100% success is required for 5 Stars on this measure, CMS's scoring decisions for each call can have a material impact on plan performance on the call center measure specifically and, in turn, on a plan's overall Star Rating.  This case is an example.  The case turns solely upon CMS's decision that a single call to Plaintiffs' call center would not be "invalidated" and instead would be counted in the study as "not successfully completed."

### F.    CMS's Criteria for Determining Whether a Call is Successfully Completed, Not Successfully Completed, or Invalidated

CMS has established criteria to decide when a call is (1) successfully completed, (2) not successfully completed, or (3) invalidated.  CMS has defined three phases a test caller must follow during the evaluation:

- Phase 1:  "Dial" the call-center number

---

[6] CMS has provided MA plans with this 2025 standard, known as cut points on its website. CMS, Part C and D Performance Data (last modified Oct. 10, 2024, 04:26 PM), https://www.cms.gov/medicare/health-drug-plans/part-c-d-performance-data.

- Phase 2:  "Connect" (which means the test caller "determines if [they] can reach a live [customer service representative] at the plan who can assist us with [CMS's] questions)."  Hold time before reaching the customer service representative cannot exceed 10 minutes.

- Phase 3:  "Introductory Question" (which means the test caller "ensure[s] [they] are speaking with a representative in the correct department" by asking a question such as "Are you the right person to answer questions about [Plan name's] health benefits?").

Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes, AR 5-6.[7] As it pertains to language assistance, if the test caller satisfies all three of these prerequisites, the call is then considered "completed" if the call-center's "[customer service representative], via an interpreter, provides an affirmative response to the introductory question (before beginning the first of three general Medicare or plan-specific accuracy questions) within eight minutes."  (AR 6.)

By defining "completed" calls, these criteria also determine which calls were not successfully completed and which should be invalidated (and therefore excluded from the study). The dividing line between these two categories of calls turns on the party to which the failure can be attributed.  During Phase 2, a call is "not successfully connected" – and therefore not successfully completed – if a customer service representative cannot be reached due to "reasons caused by the plan or the plan's phone carrier."  (AR 5.)  By contrast, CMS invalidates a call with a connection issue if the plan or its phone carrier does *not* cause the connection issue.  For example, if the test caller's phone carrier drops the call, the call should be invalidated.

---

[7] These three phases relate to testing the call center representative's "availability."  If the introductory question is asked and answered, the test caller proceeds to a fourth "accuracy" phase (not relevant here) in which the test caller determines whether answers about the pertinent plan are accurate.  *Id.*

Similarly, during Phase 3, a call is "not successfully completed" if the customer service representative fails to answer the test caller's introductory question within eight minutes after being connected. (AR 6.) CMS expressly lists the bases for classifying a call as unsuccessful, which include reaching the Call Center voicemail, receiving a busy signal, or inability to answer questions about Medicare/Medicaid. (AR 8-9.) However, CMS invalidates the call if the test caller never *asks* the introductory question (because that there is no basis for evaluating the customer service representative's response). Notably, CMS does not list failure to ask the introductory question as a basis for classifying the call as "unsuccessful." *(Id.)*[8]

In summary, the following chart illustrates the types of calls that are not successfully completed—and the types that should be invalidated—under CMS's criteria:

| **Action by CMS Test Caller** | **Included in Study as "Not Successfully Completed"** | **Invalidated** |
|---|---|---|
| Tester dials but there is no connection | Connection problem is the fault of the plan call-center or its provider | Connection problem is not the fault of the plan call-center or its provider |
| Tester dials, connects to representative, and asks the introductory question, but does not receive an adequate or timely answer from the representative | X | |
| Tester dials and connects to representative but tester does not ask the introductory question | | X |

---

[8] Failure to ask the introductory question is not identified as a basis for classifying a call as "unsuccessful," instead a call is only "considered **complete** when establishing contact with an interpreter . . ., answering the introductory question (phase 3), and then beginning the first of three general Medicare or plan-specific accuracy questions (phase 4)." (emphasis in original).

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Plaintiffs respectfully submit the following statement of undisputed materials facts.[9]

### A.    The Disputed Call

Plaintiffs share a single call center operated by their affiliated company, United HealthCare Services, Inc. ("United").  In this case, Plaintiffs' Star Rating for the "D01 – Call Center – Foreign Language Interpreter and TTY Availability" measure—as well as Plaintiffs' overall Star Ratings—turn on a single call.  That call is denominated by the identifier D0800225 (referred to hereinafter as the "disputed call").

The disputed call occurred on February 19, 2024.  During that call, a French-speaking CMS test caller was routed to a French-speaking United customer service representative within a minute after the call connected.  The CMS test caller connected to the representative, heard a voice, and said "hello." (AR 196 at 0:24; *see also* AR 66, 192 (reporting that Plaintiffs' CSR heard an audible "'hello' from the caller's side".)  On the call recording, faint rustling and breathing sounds can be heard at several points.  The call recording does not reflect any dialog between the test caller and the customer-service representative.  The recording shows that the test caller did not ask the

---

[9] In a case involving judicial review under the Administrative Procedure Act, "'the district judge sits as an appellate tribunal.'"  *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  Accordingly, "'[t]he entire case on review is a question of law,' and the 'complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action.'" *Rempfer*, 483 F.3d at 865 (quoting *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).  Therefore, the Court is not charged with the ordinary role of resolving disputes of fact, and (subject to some limited exceptions) review is limited to the administrative record before the agency at the time it made the challenged decision.  *Medina Cnty. Envt'l Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706-07 (5th Cir. 2010).  All the following facts are supported by evidence in the administrative record or in materials from which the Court can take judicial notice.

"introductory question" required by Phase 3 of CMS's evaluation criteria. Eight minutes and 17 seconds after the caller connected to the representative, the representative terminated the call. (AR 183-95, 197-99, 239 (Exs. A and B.)

Thereafter, CMS decided to include the disputed call in the call-monitoring study as a failure (i.e., "not successfully complete"). (AR 223.)

### B.    Plaintiffs' Exhaustion of the Plan Preview Process

From July 19 through September 19, 2024, Plaintiffs exhausted both parts of the plan preview process, arguing that CMS should invalidate the disputed call. The plan preview process is an informal one conducted through an exchange of emails between plans and CMS. United raised its objections (urging invalidation of the call) five different times. Each time CMS rejected the objections. (AR 223-36.)

On September 24, 2024, CMS made its final decision including the call in the study (as "not completed") and rejecting United's request to invalidate the call. That final decision is set forth in a single paragraph:

> The determination for call D0800225 will remain as is. The plan's provided recording confirms the interviewer's experience, that they connected to a CSR and heard someone say something and then cut out. The recording shows the brief noise that the interviewer referenced at the 9 second mark. *At no point during your provided recording can your plan be heard trying to engage the French speaking caller*. The attached raw data and call log confirms that the plan disconnected the call, see column O HangUpBy = Resp.

(AR 223, Native File for AR 182) (emphasis added).[10]

### C.    The Star Ratings Decision and Its Impact

CMS's decision directly reduced Plaintiffs' Star Ratings for its plans in 2025. Based on that single call, Plaintiffs' plans received a 4-Star Rating on the call center measure (instead of a

---

[10] A PDF copy of the native file for AR 182 is attached as Ex. B.

5-Star Rating, which they otherwise would have received if CMS had invalidated the call).  The change in rating for that single performance measure in turn reduced the overall Star Rating for a number of the Plaintiffs' plans by one half of a Star (e.g., 3.5 Stars instead of 4 Stars, 4 Stars instead of 4.5 Stars, or 4.5 Stars instead of 5 Stars). To be clear, a half-Star decrease has a substantial impact on enrollment.  Publicly available data show that current enrollees voluntarily *disenroll* at a substantially greater rate each time Stars decrease half a point.[11]  CMS pays plans based on the number of members enrolled in each month.  42 U.S.C. § 1395w–23(a)(1)(A). Therefore, if members choose to leave these plans, Plaintiffs will lose revenue and market share in 2025.[12]

In addition, because of the lower Star Ratings, Plaintiffs will suffer harm as new members select other plans with higher ratings.  Every year, millions of new members shop for their benefits. Medicare Plan Finder automatically sorts available plans by their Star Ratings, presenting higher rated plans first.  Because of the lower 2025 Star Rating, Plaintiffs' plans will be listed lower, making them less likely to be seen by Medicare enrollees and conveying a perception of lesser quality.

This extends beyond open enrollment.  Additional harm will occur throughout 2025, because CMS's decision will downgrade one plan from 5 Stars to 4.5 Stars.  CMS rules create special opportunities for Medicare beneficiaries to switch into plans if they have 5 Stars (but not

---

[11] CMS data from 2011 through 2023 show the following disenrollment rates:  5-Star plans = 5.3%, 4.5-Star plans = 7.1%, 4-Star plans = 10.2%, 3.5-Star plans = 13.1%, and 3-Star plans = 16.2%. CMS, Part C and D Performance Data, *available at* https://www.cms.gov/medicare/health-drug-plans/part-c-d-performance-data.

[12] "Members Choosing to Leave the Plan" is also a Star Rating measure in and of itself.  Therefore, in future years, loss of Plaintiffs' members will further degrade Plaintiffs' Star Ratings, perpetuating additional harm.  CMS, Medicare 2024 Part C & D Star Rating Technical Notes, at 76 (Mar. 13, 2024), https://www.cms.gov/files/document/2024-star-ratings-technical-notes.pdf.

if they have fewer).  While Medicare beneficiaries typically must wait until the annual election period to switch MA plans, an individual may switch into a plan that has a 5-Star Rating at any time during the year. 42 C.F.R. § 422.62(b)(15).  CMS's decision therefore will prevent this plan from gaining members through this mechanism throughout the year.

Plaintiffs filed this action on September 30 when the foregoing harm was imminent, but now the harm has begun.  On October 10, CMS released Plaintiffs' Star Ratings to the public, and the open enrollment period begins today (on October 15).

## ARGUMENT

## I.   CMS'S STAR RATINGS DECISION IS ARBITRARY AND CAPRICIOUS

The Administrative Procedure Act (APA) requires agencies to engage in reasoned decision-making. When they do not, courts invalidate their decisions as arbitrary and capricious. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal*., 591 U.S. 1, 16 (2020); 5 U.S.C. § 706(2)(A).  As explained below, CMS's decision regarding the call was arbitrary and capricious.

### A.   CMS Violated its Own Decision-Making Criteria When It Included the Disputed Call in the Study

First, CMS's decision on the disputed call is arbitrary and capricious because the agency violated its own decision-making criteria.  *See, e.g*., *Town of Barnstable v. FAA*, 659 F.3d 28, 34 (D.C. Cir. 2011) (agency's failure to follow criteria in its own internal guidelines was arbitrary and capricious); *cf. Environmentel, LLC v. FCC*, 661 F.3d 80, 84-5 (D.C. Cir. 2011) (agency's failure to follow its own regulations was arbitrary and capricious).

Under CMS's decision-making criteria, a call must be "invalidated" if connection occurs, *but* the test caller fails to ask the "introductory question" (e.g., "Are you the right person to answer questions about the plan's health benefits?") during an 8-minute interval.  *See supra* p. 8-9.  That is precisely what happened here.  Indeed, CMS does not dispute that the call connected.  (AR 75,

86, 199, 223; *see also* AR 85-86, 238 (showing "Telephony and Network Performance was at 100%" for United's phone system).)

The recording of the call clearly shows that the test caller never asked the introductory question during that period. A recording of the call shows that the CMS test caller connected to the representative, heard a voice, and said "hello."[13] Faint rustling and breathing sounds can be heard at several points, but there was no dialog between the test caller and the customer-service representative. A contemporaneous call log also indicates that the test caller was connected to a French-speaking customer service representative but did not audibly communicate with that representative in French. (AR Native Audio Files for AR 138 and AR 196, AR 197-99, 210-13, 223-25, 239 (Exs. A and B).)[14] CMS's decision was arbitrary and capricious, because the agency failed to follow its own decision-making criteria.[15]

---

[13] CMS is required to conduct the call in a foreign language. (AR 6, 11.) By speaking in English, instead of French, CMS also violated additional procedures specifying the statements that a test caller must make if it appears that a customer service representative cannot hear them. Those procedures are not in the administrative record. Plaintiffs have today filed a motion for leave to supplement the administrative record with that material so that the Court will be able to assess CMS's violation of this additional set of procedures.

[14] By failing to contact the "CSR while speaking in a foreign language," CMS failed to follow its requirements. (AR 17-18.) Further, by failing to communicate audibly, CMS also violated additional procedures specifying the statements that a test caller must make if it appears that a customer service representative cannot hear them. Plaintiffs have today filed a motion for leave to supplement the administrative record with those procedures.

[15] In CMS's call log, the test caller did enter the statement "[c]all timed out before I could get an answer to my question." (Native File for AR 182.) The statement is inconsistent with the recording of the call and also ambiguous. It could suggest that a question was asked after the call timed out, and there is no indication what the question was. Even if this opaque reference were construed as *some* evidence that the introductory question was asked during the required 8-minute interval, it certainly is not *substantial* evidence. "Substantial evidence 'means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."'" *Seaquist v. Blakey*, 210 F. App'x. 423, 425 (5th Cir. 2006) (citations omitted). An agency decision that is not supported by substantial evidence is arbitrary and capricious. *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022); *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018).

**B.    CMS's Star Ratings Decision Was Arbitrary and Capricious Because It Treated Plaintiffs Differently Than Other Similarly Situated Plans Without a Rational Basis for the Distinction**

Second, CMS's decision also independently violates the "bedrock principle of administrative law that an agency must 'treat like cases alike.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.*, 985 F.3d 472, 480 (5th Cir. 2021) (citation omitted); *Sinclair Wyoming Refining Co. LLC v. EPA*, No. 22-1073 (consol.), 2024 U.S. App. LEXIS 20424 (D.C. Cir. Aug. 14, 2024), at *64. (same).  Accordingly, an agency decision "treating similar cases dissimilarly [is] the paradigmatic arbitrary and capricious agency action." *SeaWorld of Florida, L.L.C. v. Perez*, 748 F.3d 1202, 1221 (D.C. Cir. 2014) (Kavanaugh, J., dissenting).  The Star Ratings decision is arbitrary and capricious, because CMS treated Plaintiffs' MA plans differently than those of another similarly situated health insurer (Elevance Health, Inc.).  Specifically, Plaintiffs and Elevance both had a dispute with CMS over a single call-center call.  In both disputes, CMS had no evidence that ***the call center*** was to blame for the facet of the call that CMS identified as problematic.  Nevertheless, CMS ruled against Plaintiffs (by including their call in the study) and in favor of Elevance (by invalidating its call).

In 2023, CMS evaluated the Elevance call center under the very same performance measure at issue here:  "D01 – Call Center – Foreign Language Interpreter and TTY."  CMS initially concluded that a single call had not been successful because Elevance made a mistake (even though the call had never even connected to the Elevance phone lines).  Because of that single call, CMS gave the plans a 4-star (as opposed to a 5-star) rating for that measure.  As in this case, the lower rating for that specific measure—based upon that single call—in and of itself reduced the Elevance plans' overall Star Ratings.  Elevance asserted that the ratings reduction threatened it with losses totaling tens of millions of dollars.  *See* Complaint, *Elevance Health, Inc. v. Becerra*, No. 1:23-cv-03902-RDM (D.D.C. Dec. 29, 2023), Dkt. No. 1, at ¶3, attached as Ex. C.

Elevance pursued administrative reconsideration of the decision.  CMS ultimately ruled in Elevance's favor and invalidated the call.  Elevance has publicly explained that CMS ruled in its favor because there was no evidence that Elevance was at fault:

> Based on the evidence presented by Elevance and CMS, the CMS Reconsideration Official found that there was **_no evidence the call at issue failed due to actions by Elevance_** and should not have counted against Elevance.  The CMS Reconsideration Official concluded that Elevance should have received a 100% success rate for measure D01, meriting a 5-Star rating on that measure.

Amended Complaint, *Elevance Health, Inc. v. Becerra*, No. 1:23-cv-03902-RDM, (D.D. C. Mar. 7, 2024), Dkt. No. 13, at ¶4, attached as Ex. D (emphasis added).[16]

So, too, in this case, there is no evidence that United's call center was blameworthy for the facets of the disputed call that CMS identified as problematic.  CMS had two bases for its final decision.  The first is the fact that no meaningful dialog occurred between the test caller and the call center (even though the call was connected).  (AR 223.)  But there is no evidence that the test caller asked the introductory question that would have triggered an obligation for the call center to respond (under CMS's Phase 3 evaluation criteria).  Accordingly, under those criteria, there is no evidence that the call center was at fault for the absence of dialog.

CMS's second basis for its final decision is the fact that the call center terminated the call. (AR 223 ("The attached raw data and call log confirms that the plan disconnected the call.").) There is no evidence that the call center terminated the call before the end of the eight-minute interval required by CMS's evaluation criteria.  The contemporaneous digital record of the call shows that the call was not put on hold, and that the customer service representative remained

---

[16] CMS's Elevance reconsideration decision is not in the administrative record.  Plaintiffs' motion to supplement the administrative record requests the Court to include the decision in the record of this case so that it may be considered in adjudicating the merits of the disparate treatment claim.

connected to the test caller for 8 minutes and 17 seconds before terminating the call.  (AR 239 (Ex. A) (showing "Agent Hold" of 00:00:00, "Agent Duration" of 00:08:17, and "Agent Talk" of 00:08:17).)  The test caller's call log is consistent, stating that the call center disconnected the call "after about 500 seconds."  (Native File for AR 182.)  After the CMS-required eight-minute interval, it is irrelevant who terminated the call. There is no evidence that the call center was blameworthy for terminating the call under CMS's criteria because the call center did not terminate the call before eight minutes.

The Court should conclude that Plaintiffs and Elevance are similarly situated, yet faced diametrically opposed CMS decisions.  Both cases concern (1) a single performance measure (out of dozens) that is the same; (2) CMS's application of that performance measure to a single call; (3) circumstances in which an adverse CMS ruling on that single call would, in and of itself, cause a lower overall Star Rating, and (4) there is no evidence that the issue that CMS identified as problematic can be attributed to the plan's call center.  The question whether two cases are "similarly situated" turns fundamentally on the level of generality used for the comparison.  The Court would need to look deeply into the weeds to see a difference.  The only discernable distinction is that problems arose at different times during the course of the calls:  Phase 2 for Elevance (because the call did not connect) and Phase 3 for Plaintiffs (because the test caller did not ask the "introductory question").

Distinctions this trivial do not excuse CMS from treating Plaintiffs the same way it treated Elevance.  It would always be possible to articulate some sort of factual difference between two cases if one were to focus intently enough on their minute details.  But CMS cannot legitimately dive into the detailed minutiae that way.  The agency "cannot hide behind the fact-intensive nature" of its determinations to "ignore irrational distinctions between like cases."  *Univ. of Tex. M.D.*

*Anderson Cancer Ctr.*, 985 F.3d at 480.  To the contrary, "more than an enumeration of factual differences between cases is required."  *Prairie Band Potawatomi Nation v. Yellen*, 63 F.4th 42, 47 (D.C. Cir. 2023) (citation omitted).

The critical question is whether two cases are, *in essence*, alike yet treated differently.  That is the case here.  Courts have found parties similarly situated—and held agencies responsible for arbitrary and capricious disparate treatment—when distinctions between the parties were far greater than they are here.  *See, e.g.*, *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 267, 269 (D.C. Cir. 2014) (utilities in natural gas sector and in electricity sector were similarly situated for ratemaking purposes even though regulated under different statutes and regulations); *LePage's 2000, Inc. v. Postal Regulatory Comm'n*, 642 F.3d 225, 232 (D.C. Cir. 2011) (manufacturers of teddy bears and manufacturers of mailing and shipping supplies were similarly situated for purposes of postal classification); *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776-77 (D.C. Cir. 2005) (companies that ship by railway and railway carriers were similarly situated for ratemaking purposes).

### C.    CMS's Star Ratings Decision Was Arbitrary and Capricious Because It Utterly Failed to Address United's Major Objections

An agency action is arbitrary and capricious if it is not "based on consideration of the relevant factors" or "fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*. 463 U.S. 29, 42-43 (1983); *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022).  That means an agency cannot simply ignore relevant and significant arguments that challenge its decision—otherwise the decision is arbitrary and capricious.  *See, e.g.*, *Ass'n of Private Sector Colleges and Universities v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) ("A regulation will be deemed arbitrary and capricious, if the issuing agency failed to address significant comments raised during the rulemaking."); *Liliputian Systems, Inc. v.*

*Pipeline and Hazardous Materials Safety Administration*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) (same).  That arbitrariness and capriciousness derives purely from the agency's failure to respond (and is independent of the arguments' merits):

> [The regulated private party] presents a litany of reasons that the [agency's] decision was arbitrary and capricious . . . Perhaps these contentions have merit; maybe they do not.  But unfortunately for the [agency], [its] "action must be upheld, if at all, on the basis articulated by the agency itself," [citation omitted] and here, the agency has barely articulated any basis at all.

*BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 911 (5th Cir. 2023).

CMS did not respond to any of United's three central arguments about why the call should be invalidated.  The agency's decision therefore is a textbook example of an arbitrary and capricious action.  We discuss each argument in turn below.

### 1.    CMS Ignored Plaintiffs' Argument That There Was No Evidence That the Test Caller Fulfilled the Requirements to Include the Call in the Study

United argued that there was no evidence that the test caller fulfilled the requirements to include the call in the study (because there was no evidence that the test caller asked the "introductory question" required under Phase 3 of CMS's criteria).  (AR 223-25.)  CMS never addressed this argument.  Instead, CMS attempted to shift the burden to the call center, suggesting that *it* was responsible for initiating the dialog (but had not done so).  (AR 223 ("At no point during your provided recording can your plan be heard trying to engage the French speaking caller.").)  CMS's decision was arbitrary and capricious, because the agency ignored United's argument on this central issue.

CMS's decision on the "introductory question" issue also is arbitrary and capricious for another independent reason.  In ignoring United's argument, CMS also ignored *evidence* that the test caller had no legitimate excuse for failing to ask the introductory question.  Specifically,

United presented evidence rebutting a CMS claim that the call had been put on "hold."[17]  The same evidence proved that the call had remained connected throughout the eight-minute period required by CMS's study criteria.  CMS did not address any of this evidence in its final determination.  (AR 223.)

An agency "cannot ignore evidence that undercuts its judgment."  *Genuine Parts Co.*, 890 F.3d at 312.  When an agency does that—as in this case—it renders a decision that (in APA parlance) is not supported by "substantial evidence."  A court "may not find substantial evidence 'merely on basis of evidence [that supports the agency's result], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'"  *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  An agency decision that is not supported by substantial evidence is arbitrary and capricious.  *Amin*, 24 F.4th at 393; *Genuine Parts Co.*, 890 F.3d at 312.

### 2.    CMS Ignored Plaintiffs' Disparate Treatment Objection

United raised the Elevance disparate treatment objection (discussed above) on four different occasions during the plan preview process.  (AR 225, 227, 228, 230.)  CMS utterly ignored the objection each time, including in its final decision.  (AR 223, 226, 228, 229.)

If a party "'makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument.'"  *Healthy Gulf v. FERC*, 107 F.4th 1033, 1042 (D.C. Cir. 2024) (quoting *Lemoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61

---

[17] *See* Native File for AR 182.  The evidence included (1) a recording of the call; (2) a detailed, second-by-second analysis of the sounds audible on the recording; (3) a contemporaneous digital record showing that the customer service agent was on the call for more than eight minutes; and (4) a contemporaneous call log indicating that the test caller was connected to French-speaking customer service representative but did not audibly communicate with the customer service representative.  (AR Native Audio Files for AR 138 and AR 196, AR 197-99, 210-13, 223-25, 239 (Exs. A and B).)

(D.C. Cir. 2004)).  CMS completely failed to address the issue notwithstanding its obligation, under the arbitrary and capricious standard, to "explain this differential treatment of seemingly like cases." *LePage's 2000*, 642 F.3d at 232.  CMS acted arbitrarily and capriciously, because "rather than attempt[ing] to distinguish" the different treatment of the Elevance plans, the agency has "ignored [it] completely." *Republic Airline, Inc. v. U.S. Dep't of Transportation*, 669 F.3d 296, 301 (D.C. Cir. 2012).

### 3. CMS Ignored Plaintiffs' Argument That the Disconnection of the Call was Irrelevant

CMS decided that the disputed call belonged in the study in part because the call center had disconnected the call.  United challenged that decision as well.  United acknowledged that the call center eventually disconnected the call.  But United argued that the disconnection was irrelevant, because it occurred only after the call center had waited the required interval (eight minutes)—during which time the test caller never asked the introductory question.  (AR 225.)  CMS never responded to United's relevance argument.  Instead, CMS simply said that the call "cut out" without saying when, and without disputing that the call remained connected for more than eight minutes.  (AR 223.)  CMS did not respond adequately to the issue simply by repeating that the call center cut off the call (without addressing the timing issue).  The agency effectively rejected Plaintiffs' argument simply "*because the agency says so*"—a classic example of arbitrary and capricious decision-making.  *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1196-97 (D.C. Cir. 2000) (emphasis added).

4.    **The Limited Rationale That CMS Did Provide Derived From an Impermissible Delegation of the Agency's Decision-Making Authority to a Private-Party Contractor With a Conflict of Interest**

CMS's decision is arbitrary and capricious for yet another reason.  The limited rationale the agency did provide involved an impermissible delegation of its decision-making authority to a private-party contractor.  And that contractor had a conflict of interest.

The Fifth Circuit has emphasized that a federal agency "may not 'abdicate its statutory duties' by delegating them to a private entity."  *Texas v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021) (quoting *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974)).  If agencies provide proper oversight, they may legitimately receive support from a private party under some circumstances.  But "'[a]n agency abdicates its role as a rational decision-maker,' and impermissibly subdelegates, 'if it does not exercise its own judgment, and instead cedes near-total deference to private parties' [decisions] . . . .'"  *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 551 (5th Cir. 2014) (quoting *Tex. Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 328 (5th Cir. 2001)).  Put another way, "agencies must *actually exercise* their authority rather than 'reflexively rubber stamping (sic) [work product] prepared by others.'" *Consumers' Rsch. Cause Based Commerce, Inc. v. FCC*, 109 F.4th 743,770 (5th Cir. 2024) (quoting *Sierra Club*, 502 F.2d at 59) (emphasis in original).  Otherwise their decisions are arbitrary and capricious.  *See La. Pub. Serv. Comm'n*, 761 F.3d at 551.

Here, CMS contracted with a private company (Hendall Inc.), which in turn retained a private-party subcontractor (AIR), to "monitor the performance of plan sponsors' call centers with respect to the standards at 42 C.F.R. § 422.111(h)(1) and 42 C.F.R. § 423.128(d)(1)."  (AR 33.)  Section 422.111(h)(1) establishes the call-center regulatory requirements at issue in this case.  *See supra* at [5].  On September 13, 2024, United submitted an audio recording of the disputed call, arguing that there was no evidence that there was a problem on the call center's end (as opposed

to the tester's end) of the call.  (AR 154.).  Thirteen minutes later, CMS referred the matter to the contractor, asking what the agency should do:

> UHS [*sic*] is back again, let me know if the recordings change anything.

(AR 154.)  On September 16, the contractor recommended denying the objection on the ground that "[t]he plan's recording confirms the interviewer's experience, that they connect[ed]to a CSR and heard someone say something and then cut out."  (AR 153.)  Later that same day, CMS denied United's objection.  In so doing, CMS repeated the foregoing language from the contractor— verbatim—as the primary basis for the agency's decision.  (AR 212.)

The same thing then happened a second time.  The following week, in its final decision about the disputed call, CMS again repeated the contractor's language (verbatim) as the primary basis for its decision.  (AR 223.)  CMS acted arbitrarily and capriciously by "ced[ing] near-total deference" to the private contractor's decision.  *La. Pub. Serv. Comm'n*, 761 F.3d at 551.

To make matters worse, the private contractor had a conflict of interest in making this determination.  CMS's government contract gives Hendall Inc. (through its subcontractor AIR) the responsibility to make the test calls as well as the responsibility to evaluate plans' performance in response to test calls.[18]    Hendall  Inc. – Deliver  Order  #  PIID  75FCMC12F0120, USASPENDING    (last    visited    Oct.    15,    2024),

---

[18]  *See also* American Institutes for Research, Survey II Accuracy & Accessibility Study Interviewer Training Manual - CMS Call Center Monitoring, at 2 (Jan. 2023), Pl. Mot. to Supplement Admin. Record (forthcoming), Exh. A. at 8 ("The purpose of the evaluation program is to provide information to CMS to ensure that organizations contracted to provide Medicare services are meeting their obligation to answer each call from current and prospective members in a timely manner and to provide the services and information required by their contracts.").  Those procedures are not in the administrative record.  Plaintiffs have today filed a motion for leave to supplement the administrative record with that material so that the Court will be able to assess CMS's violation of this additional set of procedures.

https://www.usaspending.gov/award/CONT_AWD_75FCMC23F0120_7530_47QRAA19D001 A_4732; *see also* AR 66 (demonstrating Hendall Inc.'s role in assessing compliance with testing conditions).  The evaluation of the disputed call required determining whether the call center—or *the test caller*—was at fault.  In this situation, therefore, Hendall (through AIR) was put in a position in which it had to evaluate its *own conduct*.  And when AIR decided that the call center was at fault, AIR necessarily absolved its own test caller of responsibility:

> Recommend keeping outcome as is since the plan's recording supports *our interviewer's* experience.

(AR 153 (emphasis added).)  Hendall had a conflict of interest, because it had a "stake in the project which it was evaluating." *Sierra Club v. Sigler*, 695 F.2d 957, 962 n.3 (5th Cir. 1983).  An agency "may not delegate its public duties to private entities, . . . particularly private entities whose objectivity may be questioned on grounds of conflict of interest."  Referring the matter to a contractor with a conflict of interest was a "clear error of judgment" that rendered the decision arbitrary and capricious. *Calumet Shreveport Refin., L.L.C. v. EPA*, 86 F.4th 1121, 1133 (5th Cir. 2023) (citation omitted).

### 5.    The Court Must Evaluate CMS's Decision Based Upon its Stated Rationale, Not a Post-Hoc Rationalization

It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015); *In re Bell Petroleum Servs.*, 3 F.3d 889, 905 (5th Cir. 1993).  In other words, the agency's "action must be measured by what [it] did, not by what it might have done." *Michigan*, 576 U.S. at 759 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 93-94 (1943)).  Accordingly, if the Court "find[s] that an agency's stated rationale for its decision is erroneous, [the Court] cannot sustain its action on some other basis the agency did not mention." *PDK Laboratories, Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004); *Select Specialty Hospital - Bloomington, Inc. v. Burwell*,

757 F.3d 308, 314 (D.C. Cir. 2014) (citation omitted) (stating that a court's "review is constrained to the rationale provided by the [agency] . . . however unintelligible it may be").

That means it is too late for CMS to respond to United's objections now.  Under the foregoing principles, the agency is not "free to defend its decision by supplying new, *post hoc* rationalizations for it when sued." *Wages & White Lion Invs., L.L.C. v. FDA*, 90 F.4th 357, 371 (5th Cir. 2024).  That prohibition forecloses any "'post hoc salvage operations of counsel'" that CMS might wish to pursue in its opposition to this motion for summary judgment. *Spirit Airlines, Inc. v. United States*, 997 F.3d 1247, 1256 (D.C. Cir. 2021) (quoting *Fla. Power & Light Co. v. FERC*, 85 F.3d 684, 689 (D.C. Cir. 1996)).

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and issue a declaratory judgment and permanent injunction.  The injunction should require CMS to recalculate forthwith Plaintiffs' 2025 Star Ratings without considering the disputed call and immediately publish the recalculated Star Ratings in the Medicare Plan Finder.

Time is of the essence.   The harm to Plaintiffs from arbitrarily downgraded Star Ratings began October 10 (when the Ratings were released), escalated today (when annual enrollment starts) and will continue to build every day thereafter.  Given CMS's clear violation of its own decision-making criteria, there is no need or warrant for a remand to CMS, which would only delay the proceedings and exacerbate the harms. Plaintiffs respectfully request the Court to issue the injunction by the end of November, so that there is at least a short interval with correct Star Ratings before the annual enrollment period ends on December 7.

Respectfully submitted,

  /s/ *Daniel G. Jarcho*
Daniel G. Jarcho (D.C. Bar #391837)
Kelley C. Barnaby (D.C. Bar #998757)
Christopher J. Frisina (D.C. Bar #1033185)
daniel.jarcho@alston.com
kelley.barnaby@alston.com
christopher.frisina@alston.com
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC  20004
Telephone: (202) 239-3300
Facsimile: (202) 239-3333

Jared M. Slade
Texas State Bar No. 24060618
jared.slade@alston.com
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, Texas 75201
Telephone: 214-922-3400
Facsimile: 214-922-3899

*Attorneys for Plaintiffs*

**FILED UNDER SEAL**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing MOTION FOR SUMMARY

JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT has been served via electronic

mail this 15th day of October, 2024 to:

> JAMES G. GILLINGHAM
> Assistant United States Attorney
> Texas State Bar No. 24065295
> james.gillingham@usdoj.gov
> 110 N. College, Suite 700
> Tyler, TX 75702
> Tel: (903) 590-1400
> Fax: (903) 590-1436
>
> *Counsel for Defendants*


                                    /s/ *Daniel G. Jarcho*
                                    Daniel G. Jarcho