**FILED UNDER SEAL**

# Exhibit C

# Elevance Complaint

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ELEVANCE HEALTH, INC.,**

220 Virginia Avenue
Indianapolis, IN 46204,

**AMH HEALTH PLANS OF MAINE, INC.,**

2 Gannett Drive
South Portland, ME 04106,

**AMH HEALTH, LLC,**

2 Gannett Drive
South Portland, ME 04106,

**ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY**,

21215 Burbank Boulevard
Woodland Hills, CA 91367,

**ANTHEM HEALTHCHOICE HMO, INC.,**

Penn 1, 35th Floor
New York, NY 10119

**ANTHEM HEALTH PLANS, INC**,

108 Leigus Road
Wallingford, CT 06492,

**ANTHEM INSURANCE COMPANIES, INC.,**

220 Virginia Avenue,
Indianapolis, IN 46204,

Case No. _____

**BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA, INC.,**

740 W. Peachtree Street
Atlanta, GA 30308,

**BLUE CROSS OF CALIFORNIA**,

21215 Burbank Boulevard
Woodland Hills, CA 91367,

**COMMUNITY CARE HEALTH PLAN OF LOUISIANA, INC.,**

3850 N. Causeway Boulevard, Suite 1770
Metairie, LA 70002,

**COMMUNITY INSURANCE COMPANY**,

4361 Irwin Simpson Road
Mason, OH 45040,

**COMPCARE HEALTH SERVICES INSURANCE CORPORATION,**

N17 W24222 Riverwood Drive, Suite 300
Waukesha, WI 53188,

**HEALTHKEEPERS, INC.,**

2015 Staples Mill Road
Richmond, VA 23230,

**HEALTHPLUS HP, LLC,**

PENN 1, 35th Floor
New York, NY 10119,

**HEALTHSUN HEALTH PLANS, INC.,**

9250 W. Flagler Street, Suite 600
Miami, FL 33174,

**HMO COLORADO, INC.**,

700 Broadway
Denver, CO 80203,

**MATTHEW THORNTON HEALTH
PLAN, INC.**,

1155 Elm Street
Manchester, NH 03101,

**WELLPOINT INSURANCE COMPANY**,

2505 N Hwy 360, Suite 300
Grand Prairie, TX 75050,

**WELLPOINT IOWA, INC.**,

4800 Westown Parkway, Suite 200
West Des Moines, IA 50266,

**WELLPOINT NEW JERSEY, INC.**,

101 Wood Avenue South, Suite 800
Iselin, NJ 08830,

**WELLPOINT OHIO, INC.**,

4361 Irwin Simpson Road
Mason, OH 45040,

**WELLPOINT TENNESSEE, INC.**,

22 Century Boulevard, Suite 220
Nashville, TN 37214,

**WELLPOINT TEXAS, INC.**,

2505 N Hwy 360, Suite 300
Grand Prairie, TX 75050,

**WELLPOINT WASHINGTON, INC.,**

705 5th Avenue South, Suite 300
Seattle, WA 98104

     Plaintiffs,

v.

**XAVIER BECERRA**, in his official capacity
as Secretary of Health and Humana Services,
U.S. Department of Health and Humana
Services

200 Independence Avenue SW
Washington, D.C. 20201,

and

**CHIQUITA BROOKS-LASURE**, in her
official capacity as Administrator, Centers for
Medicare and Medicaid Services

7500 Security Boulevard
Baltimore, MD 21244,

     Defendants.

---

## COMPLAINT

  Plaintiffs Elevance Health, Inc. f/k/a Anthem Inc. ("Elevance"), along with its affiliated

entities AMH Health Plans of Maine, Inc.; AMH Health, LLC; Anthem Blue Cross Life and Health

Insurance Company; Anthem Healthchoice HMO, Inc.; Anthem Health Plans, Inc.; Anthem

Insurance Companies, Inc.; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; Blue Cross

of California; Community Care Health Plan of Louisiana, Inc.; Community Insurance Company;

Compcare Health Services Insurance Corporation; Healthkeepers, Inc.; HealthPlus HP, LLC;

HealthSun Health Plans, Inc.; HMO Colorado, Inc.; Matthew Thornton Health Plan, Inc.;

Wellpoint Insurance Company; Wellpoint Iowa, Inc.; Wellpoint New Jersey, Inc.; Wellpoint Ohio, Inc.; Wellpoint Tennessee, Inc.; Wellpoint Texas, Inc.; Wellpoint Washington, Inc. (the "Health Plan Plaintiffs," and collectively with Elevance, "Plaintiffs"), by and through their undersigned counsel, hereby submit their complaint for relief against defendants Xavier Becerra, in his official capacity as Secretary of Health and Human Services ("HHS"), and Chiquita Brooks-LaSure, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services ("CMS"), to challenge unlawful, and arbitrary and capricious final agency action related to the Star Ratings system for Medicare Advantage and Part D health plan contracts, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 551-559 and 701-706.

## PRELIMINARY STATEMENT

1.      Medicare Advantage Star Ratings are a process implemented by Defendants to rate the overall quality of Medicare Advantage organizations on a scale of 1 to 5 "Stars." CMS calculates Star Ratings by examining data and information relating to individual measures that are intended to assess the overall quality of the plan in several broad categories. A plan's overall Star Rating is a weighted assessment of the individual measures and the Star Rating has significant financial and operational ramifications depending on the score awarded to the plan. For instance, if a Medicare Advantage organization receives a 4-Star rating, it is entitled to Quality Bonus Payments that can amount to millions of dollars or more and which are used to directly benefit Medicare beneficiaries. Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. §§ 702, *et seq.*, to rectify two aspects of Defendants' conduct in issuing 2024 Star Ratings.

2.      First, Defendants calculate "cut points" for certain individual measures to determine whether plan receives a 1, 2, 3, 4, or 5 Star for that specific measure. In calculating the cut points, 42 C.F.R. § 422.166 establishes a "guardrail" such that the cut point from one year to

the next cannot increase or decrease more than 5%. Despite that unambiguous and clear regulatory obligation, CMS set cut points for 2024 Star Ratings that exceed the 5% guardrail—causing a dramatic downward shift in Star Ratings across the industry and with respect to Plaintiffs specifically. Defendants' action is directly contrary to the law and arbitrary and capricious.

3.      Second, for one specific measure used to calculate Star Ratings—D01 (Call Center-Foreign Language Interpreter and TTY Availability)—Defendants arbitrary and capriciously calculated cut points and determined Plaintiffs' Star Ratings for this measure. Specifically, for this measure, Defendants seek to evaluate the plan's accessibility by using "secret shopper" callers to call the plans. With respect to Plaintiffs, Defendants incorrectly concluded that they missed a single call, despite Defendants' own evidence that the call never even connected to Plaintiffs' phone lines through no fault of Plaintiffs. Based upon that erroneous conclusion as to the single call, Defendants also determined that Plaintiffs failed to meet the cut point for a 5-Star rating for this measure, resulting in Plaintiffs losing out on tens of millions of dollars in Quality Bonus Payments. Defendants' actions were contrary to the law and arbitrary and capricious.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331. This action arises under the Medicare Act, 42 U.S.C. § 1395 *et seq*.; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 and 706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

5.      Venue is proper under 28 U.S.C. § 1391(e).

6.      This Complaint is timely filed. *See* 28 U.S.C. § 2401.

## PARTIES

7.      Elevance is a healthcare company with its principal place of business in Indianapolis, Indiana. Elevance aims to transform healthcare by becoming a lifetime trusted

partner to its members by focusing on whole health, including physical, behavioral, social, and pharmacy, with a goal to improve healthcare affordability, accessibility, quality, and equity.

8. Elevance, through direct and indirect subsidiaries such as the Health Plan Plaintiffs, among other things operates numerous health plans in 22 states and Puerto Rico to provide medical and prescription coverage to approximately 2.9 million Medicare beneficiaries under Medicare Parts C and D. Specifically, the following Health Plan Plaintiffs are direct or indirect subsidiaries of Elevance that enter into contracts with Defendants to provide coverage to Medicare beneficiaries under Medicare Parts C and/or D:

    a.    AMH Health Plans of Maine, Inc. has its principal place of business in South Portland, Maine, and has entered into a contract with CMS designated as H9219;

    b.    AMH Health, LLC has its principal place of business in South Portland, Maine, and has entered into a contract with CMS designated as H9065;

    c.    Anthem Blue Cross Life and Health Insurance Company has its principal place of business in Woodland Hills, California, and has entered into a contract with CMS designated as H8552;

    d.    Anthem Healthchoice HMO, Inc. has its principal place of business in New York, New York, and has entered into a contract with CMS designated as H8432;

    e.    Anthem Health Plans, Inc. has its principal place of business in Wallingford, Connecticut, and has entered into contracts with CMS designated as H2836 and H5854;

f.   Anthem Insurance Companies, Inc. has its principal place of business in Indianapolis, Indiana, and has entered into contracts with CMS designated as H1607, H4036, H4909, R4487, and R5941;

g.   Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. has its principal place of business in Atlanta, Georgia, and has entered into a contract with CMS designated as H5422;

h.   Blue Cross of California has its principal place of business in Woodland Hills, California, and has entered into a contract with CMS designated as H0544;

i.   Community Care Health Plan of Louisiana, Inc. has its principal place of business in Metairie, Louisiana, and has entered into a contract with CMS designated as H1947;

j.   Community Insurance Company has its principal place of business in Mason, Ohio, and has entered into contracts with CMS designated as H3655 and H7093;

k.   Compcare Health Services Insurance Corporation has its principal place of business in Waukesha, Wisconsin, and has entered into a contract with CMS designated as H9525;

l.   Healthkeepers, Inc. has its principal place of business in Richmond, Virginia, and has entered into a contract with CMS designated as H3447;

m.   HealthPlus HP, LLC has its principal place of business in New York, New York, and has entered into a contract with CMS designated as H1732;

n.      HealthSun Health Plans, Inc. has its principal place of business in Miami, Florida, and has entered into a contract with CMS designated as H5431;

o.      HMO Colorado, Inc. has its principal place of business in Denver, Colorado, and has entered into a contract with CMS designated as H4346;

p.      Matthew Thornton Health Plan, Inc. has its principal place of business in Manchester, New Hampshire, and has entered into a contract with CMS designated as H3536;

q.      Wellpoint Insurance Company has its principal place of business in Grand Prairie, Texas, and has entered into a contract with CMS designated as H8849;

r.      Wellpoint Iowa, Inc. has its principal place of business in West Des Moines, Iowa, and has entered into a contract with CMS designated as H0907;

s.      Wellpoint New Jersey, Inc. has its principal place of business in Iselin, New Jersey, and has entered into a contract with CMS designated as H3240;

t.      Wellpoint Ohio, Inc. has its principal place of business in Mason, Ohio, and has entered into a contract with CMS designated as H1423;

u.      Wellpoint Tennessee, Inc. has its principal place of business in Nashville, Tennessee, and has entered into a contract with CMS designated as H5828;

v.      Wellpoint Texas, Inc. has its principal place of business in Grand Prairie, Texas, and has entered into a contract with CMS designated as H2593; and

w.      Wellpoint Washington, Inc. has its principal place of business in Seattle, Washington, and has entered into a contract with CMS designated as H1894.

9. Defendant Xavier Becerra is sued in his official capacity as the Secretary of HHS. This includes overseeing the operations of CMS. Secretary Becerra, in his official capacity, is responsible for implementing and complying with federal law, including the federal laws impacted by this action.

10. Defendant Chiquita Brooks-LaSure is sued in her official capacity as Administrator of CMS, an operating division of HHS. As Administrator, Ms. Brooks-LaSure is responsible for the administration of the Medicare health program, including Medicare Parts C and D. Administrator Brooks-LaSure, in her official capacity, is responsible for implementing and complying with federal law.

## FACTUAL ALLEGATIONS

### *The Medicare Advantage Program*

11. The Medicare program, authorized under Title XVIII of the Social Security Act, is a federal health insurance program that generally provides certain healthcare benefits for people age 65 and older and under 65 with certain disabilities or diseases. HHS is the federal agency responsible for administering the Medicare program and does so through CMS.

12. Generally, people who are eligible for Medicare have two options to receive medical benefits. First, under Medicare Parts A and B (often referred to as "original" or "traditional" Medicare), eligible individuals may receive Medicare benefits directly from the federal government. *See* 42 U.S.C. §§ 1395c to 1395i-6 (Part A); 42 U.S.C. §§ 1395j to 1395w-6 (Part B).

13. Alternatively, under Medicare Part C—commonly referred to as the Medicare Advantage program as enacted by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003—CMS contracts with private organizations referred to as Medicare

Advantage Organizations ("MAOs"). Medicare eligible individuals then may enroll in health plans offered by the MAO and the MAO is responsible for providing Medicare benefits to their enrollees. Congress established the Medicare Advantage program to expand the availability of private health plan options to Medicare beneficiaries, with the goal of controlling spend for the federal government and generating cost savings for enrollees through market competition and the greater use of managed care. *See* Medicare Program, *Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4588, 4589 (Jan. 28, 2005) (codified at 42 C.F.R. pts. 417, 422).

14.     In addition, under Medicare Part D ("Part D"), Medicare beneficiaries may choose to receive prescription drug benefits under the Medicare Voluntary Prescription Drug Benefit Program. Part D is a voluntary program—meaning that Medicare beneficiaries must choose to enroll in it. Part D is entirely administered by HHS through private organizations called Part D Plans ("PDPs") that can either be stand-alone PDPs or an MAO may offer Part D benefit plans in conjunction with their Part C plans, which are referred to as "MA-PD" plans.

15.     MAOs that contract with CMS assume the financial risk of providing healthcare to enrollees that CMS would otherwise bear. MAOs generally receive a per member, per month payment in return for providing coverage to their enrollees for all traditional Medicare services. In addition, MAOs may be eligible to cover additional services beyond those covered by traditional Medicare program if they are eligible to do so through the bid process.

16.     In order to enter into contracts with CMS, MAOs must prepare and submit financial bids every year to CMS. In forming their bids, MAOs must analyze their expected revenues and costs related to the services they provide. 42 U.S.C. 1395w–24(a)(6)(A). The bid and its supporting documentation are a complex submission. In addition to the bid amount itself, MAOs must submit a detailed package to CMS stating the specific benefits and cost sharing

amounts their plans will cover, for both Medicare Advantage medical coverage and Part D prescription drug coverage. 42 U.S.C. 1395w–24(a)(6)(A).

17.     In addition, MAOs must submit a detailed financial breakdown of how the plan arrived at its bid amount, with the actuarial basis and support for those calculations. 42 U.S.C. 1395w–24(a)(6)(A)(ii)-(iii). This must be prepared in accordance with accepted actuarial principles and certified by a qualified actuary. 42 C.F.R. § 422.254(b)(5). Each separate benefit plan offering submitted by a Medicare Advantage plan requires its own bid and supporting documentation. 42 C.F.R. § 422.254(f). The process takes months and bids are due the first Monday of June.

18.     If an MAO's bid is below the applicable benchmark—as is often the case—then the plan keeps part of the difference between the bid and benchmark in the form of a rebate that is shared between the federal government and plans. MAOs generally are required to use their portion of the rebate to lower patient cost sharing, lower premiums, provide some coverage for benefits not included in traditional Medicare, or cover certain administrative expenses. Upon acceptance of the MAO's bid and product design, CMS then enters into a contract with the plan for the applicable contract year.

19.     The Medicare Advantage program is intended to offer several types of plans to Medicare beneficiaries with expanded benefits beyond those offered by traditional Medicare. To that end, MAOs that submit bids under the federal benchmark and that can provide supplemental benefits beyond those covered by Medicare (such as dental, vision, or medical transportation), as well as reduce member cost-sharing and premiums, are best positioned in the market to attract potential enrollees.

*Medicare Advantage Star Ratings*

20.     In 2008, CMS began publishing annual Star Ratings for MAOs ("Star Ratings"), which are based upon certain data sets to rate each plan on a scale of one to five stars. *See* 42 U.S.C. § 1395w-23(o); *see also* 42 C.F.R. Part 422, Subpart D. The purpose of Star Ratings is to measure the quality of health and drug services received by consumers enrolled in MAOs and PDPs. According to CMS, "the Star Ratings system helps Medicare consumers compare the quality of Medicare health and drug plans being offered so they are empowered to make the best health care decisions for them . . . [and] to provide Medicare consumers and their caregivers with meaningful information about quality alongside information about benefits and costs to assist them in being informed and active health care consumers." *See 2024 Medicare Advantage and Part D Star Ratings*, CENTERS FOR MEDICARE & MEDICAID SERVICES (October 13, 2023), https://www.cms.gov/newsroom/fact-sheets/2024-medicare-advantage-and-part-d-star-ratings.

21.     A plan's annual Star Rating is calculated as the weighted average of its Star Ratings across several individual measures. Specifically, CMS identifies certain measures that it intends to use in any given year for Medicare Advantage, Part D, or MA-PD plans. For instance, for 2024 Star Ratings, MA-PD plans are rated on up to 40 unique quality and performance measures applicable to both Part C and Part D, whereas Medicare Advantage-only contracts are rated on up to 30 Part C measures. Stand-alone PDP contracts are rated on up to 12 Part D measures. *See* CMS Relations, *Fact Sheet - 2024 Medicare Advantage and Part D Star Ratings*, CENTERS FOR MEDICARE & MEDICAID SERVICES (October 13, 2023), https://www.cms.gov/files/document/101323-fact-sheet-2024-medicare-advantage-and-part-d-ratings.pdf (for a full listing of the 40 measures used to determine an MA-PD plan's 2024 Star Rating). Examples of those measures include C01 Breast Cancer Screening (the "percent of female

plan members aged 52-74 who had a mammogram during the past 2 years") and C02 Colorectal Cancer Screening ("the "percent of plan members aged 50-75 who had appropriate screening for colon cancer). Each measure is derived from a specified data source identified by CMS in a given year. For example, for 2024 Star Ratings, NCQA HEDIS data for the plan from the year 2022 is used to evaluated measures C01 Breast Cancer Screening and C02 Colorectal Cancer Screening.

22.     The individual measures are separated into the following five broad categories: (i) Outcomes, which reflect improvements in a beneficiary's health and are central to assessing quality of care; (ii) intermediate outcomes, which reflect actions taken which can assist in improving a beneficiary's health status; (iii) patient experience, which reflect beneficiaries' perspectives of the care they received; (iv) access, which reflect processes and issues that could create barriers to receiving needed care; and (v) process, which capture the health care services provided to beneficiaries which can assist in maintaining, monitoring, or improving their health status.

23.     For the 2024 Star Ratings, CMS assigned the highest weight to improvement measures, followed by patient experience/complaints and access measures, then outcome and intermediate outcome measures, and finally process measures. *Medicare 2024 Part C & D Star Ratings Technical Notes*, CENTERS FOR MEDICARE AND MEDICAID SERVICES (Nov. 8, 2023), https://www.cms.gov/files/document/2024technotes20230929.pdf. New measures included in the Star Ratings are given a weight of 1 for their first year of inclusion in the ratings; in subsequent years the weight associated with the measure weighting category is used. In calculating the summary and overall ratings, a measure given a weight of 3 counts three times as much as a measure given a weight of 1. For any given contract, any measure without a rating is not included in the calculation.

24.     The Star Rating assigned by CMS to a particular plan is critically important to an MAO. As described more fully below, a plan's Star Rating will have a direct impact upon the amount of payment that CMS makes to an MAO and furthermore directly impacts the premiums and benefits that the plan is able to offer. In addition, the Star Rating is intended to influence beneficiaries' choice to enroll in an MAO's plans.

*CMS Uses "Cut Points" When Assigning Stars For Certain Individual Measures*

25.     To calculate the plans' overall Star Rating, each measure receives a measure-specific Star Rating based upon an analysis of the data identified by CMS for that particular measure. For many measures, CMS calculates "cut points" to determine the Star Rating for the specific measure across all plans. For the majority of Star Ratings measures, CMS determines the measure cut points using the information provided from a hierarchical clustering algorithm which is designed to identify the natural gaps that exist within the distribution of the scores and creates groups (clusters) that are separated into the pre-specified number of categories.

26.     For Star Ratings, CMS runs the clustering algorithm with the goal of determining four cut points that are used to create five non-overlapping groups that correspond to each of the Star Ratings. The scores are grouped such that scores within the same Star Ratings category are as similar as possible, and scores in different categories are as different as possible.

27.     The groups are then used for the conversion of the measure scores to one of five Star Ratings categories. Star Ratings levels 1 through 5 are assigned with 1 being the worst and 5 being the best. For most measures, a higher score is better, and thus, the group with the highest range of measure scores is converted to a rating of five stars. For some measures a lower score is better, and thus, the group with the lowest range of measure scores is converted to a rating of five stars. Ultimately, the methodology converts measure-specific scores to measure-level Star Ratings

so as to categorize the most similar scores within the same measure-level Star Ratings while maximizing the differences across measure-level Star Ratings. If a measure is calculated using cut points, CMS will analyze the data for all applicable MAO contracts to determine the scores needed to achieve a 1, 2, 3, 4, or 5 Star Rating for that particular measure.

*CMS Is Required To Apply "Guardrails" That Prohibit It From*
*Changing Any "Cut Point" By More Than 5 Percentage Points From Year To Year*

28. Beginning in April 2019, CMS adopted the use of "guardrails" to cap the amount of any increases or decreases in measure cut point values from one year to the next.

29. That is, CMS amended 42 C.F.R. § 422.166(a)(2)(i) to require the use of guardrails, or "measure-specific caps in both directions," which ensure that "the measure-threshold-specific cut points do not increase or decrease more than the cap from one year to the next." *See* 84 Fed. Reg. 15680, 15754 (Apr. 16, 2019) (corrections to final rule published in 84 Fed. Reg. 26578 (June 7, 2019)). CMS set a 5-percentage-point absolute cap for measures on a 0 to 100 scale, such that the "measure-threshold-specific cut points for non-CAHPS measures do not increase or decrease more than the [5-percent] cap from one year to the next." 42 C.F.R. § 422.166(a)(2)(i) (2020); *see also id.* at 15830.

30. As CMS explained when it adopted the 5-percentage-point absolute cap, "[g]uardrails at 5 percent provide a balance between providing predictability in cut points while also allowing cut points to keep pace with changes in measure scores in the industry." 84 Fed. Reg. at 15757.

31. In its current form, 42 C.F.R. § 422.166(a)(2)(i) states, in pertinent part:

Effective for the Star Ratings issued in October 2022 and subsequent years, **CMS will add a guardrail so that the measure-threshold-specific cut points for non-CAHPS measures do not increase or decrease more than the value of the cap from 1 year to the next. The cap is equal to 5 percentage points for measures having a 0 to 100 scale (absolute percentage cap) or 5 percent of the restricted range for measures not having a 0 to 100 scale (restricted range cap).** New

16

measures that have been in the Part C and D Star Rating program for 3 years or less use the hierarchal clustering methodology with mean resampling with no guardrail for the first 3 years in the program.

42 C.F.R. § 422.166(a)(2)(i) (2023) (emphasis added).

32.    CMS's stated intent in adding guardrails to its Star Rating methodology was to increase the predictability and stability of cut points. *See* 84 Fed. Reg. at 15757 (reflecting CMS's position in April 2019 that "the guardrails [were] a key component of how [it] intend[ed] the cut point methodology to provide stability and predictability from year to year, in balance with reflecting true performance" and that the guardrails would "lead to increased stability and predictability of cut points"); *see also* 87 Fed. Reg. 79452, 79625 (proposed Dec. 27, 2022) (reflecting CMS's December 2022 acknowledgment that by adding guardrails to its Star Ratings methodology, "[t]he intent of th[e] change in methodology was to increase the predictability and stability of cut points").

<u>*CMS's Introduction Of Tukey Outlier Deletion Methodology*</u>

33.    In 2020 rulemaking, CMS introduced the idea that it would add Tukey outlier deletion to the hierarchical clustering methodology set forth in 42 C.F.R. § 422.166(a)(2), for initial implementation to begin with the 2024 Star Ratings. 85 Fed. Reg. 9002, 9009, 9044 (proposed Feb. 18, 2020); *see also* 85 Fed. Reg. 33796, 33833-36 (June 2020).

34.    Generally, an outlier is a data point that differs greatly (much smaller or larger) from other values in a dataset. Using Tukey outlier deletion, CMS would identify and delete outlier contracts before applying the already-applicable mean resampling and hierarchical clustering processes for all non-CAHPS measures. *Medicare 2024 Part C & D Star Ratings Technical Notes*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Nov. 8, 2023), at 17, https://www.cms.gov/files/document/2024technotes20230929.pdf. According to CMS, Tukey outer fence outlier contract scores are those defined as measure-specific scores outside the bounds

17

of 3.0 times the measure-specific interquartile range subtracted from the 1ˢᵗ quartile or added to the 3ʳᵈ quartile. *Id.*

35.     By its design, the Tukey outlier deletion methodology would remove the lower and upper outer fences and would only remove cases that are identified as outliers. 85 Fed. Reg. at 33833. "Values identified as outside the Tukey outer fences would then be removed immediately prior to clustering." *Id.*

36.     Initial implementation of Tukey outlier deletion methodology was to begin with the 2024 Star Ratings. *See* 42 C.F.R. § 422.166(a)(2)(i) ("Effective for the Star Ratings issued in October 2023 and subsequent years, prior to applying mean resampling with hierarchal clustering, Tukey outer fence outliers are removed."). Notably, however, the implementation of Tukey outlier deletion methodology has been fraught with errors and ambiguities during rulemaking. Indeed, despite initially including regulatory text stating that it would implement Tukey outlier deletion methodology beginning in 2024, in subsequent rulemaking CMS actually deleted the applicable language regarding that methodology from the regulatory text in 42 C.F.R. § 422.166 (effective June 8, 2022). *See* 87 Fed. Reg. 27704, 27895 (May 9, 2022). CMS later added the above language back into the regulatory text in 2023, indicating that the relevant sentence "was inadvertently removed from the codified regulation text." 88 Fed. Reg. 22120, 22295 (Apr. 12, 2023).

*Since Adding The Tukey Outlier Deletion Methodology, CMS Considered Whether To Remove The 5-Percent Guardrails But Has Declined To Do So At This Stage*

37.     In December 2022 proposed rules, CMS proposed to modify the clustering methodology used to set cut points under 42 C.F.R. § 422.166(a)(2)(i) by "eliminating the guardrails that restrict the maximum allowable movement of non-CAHPS measure cut points" beginning with 2026 Star Ratings. 87 Fed. Reg. at 79625-26.

38.     In the preamble to the December 2022 proposed rules, CMS expressed its view that implementation of Tukey beginning with the 2024 Star Ratings "minimizes the need for the guardrails to achieve [the predictability and stability of cut points] and weakens the rationale of the guardrails policy at the time the policy was finalized." *Id.* at 79625.

39.     Specifically, CMS explained:

> [T]he combination of mean resampling and Tukey outlier deletion, with Tukey outlier deletion being finalized after the bi-directional guardrails policy, ***will provide sufficient predictability and stability of cut points from one year to the next*** when there are not significant changes in overall industry performance, but at the same time allow cut points to adjust when there are significant changes in performance as there was during the COVID–19 pandemic. ***We believe it is important for cut points to be allowed to shift by more than 5 percentage points*** when there are unanticipated, large changes in industry performance in the future.

*Id.* at 79626 (emphasis added).

40.     Accordingly, CMS proposed to amend § 422.166(a)(2)(i) to "modify the language so that guardrails for non-CAHPS measures will only be effective through the 2025 Star Ratings released in October 2024, and not apply for the 2026 Star Ratings or beyond." *Id.* CMS requested feedback on this proposed change. *Id.*

41.     Critically, despite soliciting comment on its proposal to remove the 5-percentage point guardrails from the methodology by which it calculates Star Ratings, CMS determined not to amend § 422.166(a)(2)(i) by eliminating the 5-percentage point guardrails, which are still required by law.

42.     Rather, CMS stated in the preamble to its April 2023 final rule that various provisions of the proposed rule—including CMS's proposal to "remov[e] guardrails (that is, bi-directional caps that restrict upward and downward movement of a measure's cut points for the current year's measure-level Star Ratings compared to the prior year's measure-threshold specific cut points) when determining measure-specific-thresholds for non-[CAHPS] measures"—are "not

being finalized in this [final] rule and instead will be addressed in a later final rule." 88 Fed. Reg. at 22121.

43.     As of the date of this filing, CMS has not yet responded to any comments it received in response to its December 2022 proposal to eliminate the 5-percentage point guardrails, much less amended § 422.166(a)(2)(i) to change the rule.

44.     Moreover, CMS reaffirmed the importance of the guardrails in its own sub-regulatory guidance published this year for the 2024 Star Ratings, which states:

> *Guardrails are used to cap the amount of increase or decrease in measure cut point values from one year to the next*. Specifically, each 1 to 5 star level cut point is *compared to the prior year's value and capped at an increase or decrease of at most 5 percentage points* for measures having a 0 to 100 scale (absolute percentage cap) or *at most 5 percent of the prior year's restricted score range* for measures not having a 0 to 100 scale (restricted range cap). The final capped cut points after comparing each 1 through 5 star level cut point to the *prior year's values* are used for assigning measure stars.

*Medicare 2024 Part C & D Star Ratings Technical Notes*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Nov. 8, 2023), at 18 (emphasis added).

45.     Accordingly, CMS was required to apply the 5-percentage point guardrails when it assigned Star Ratings for 2024.

### CMS Violated The Guardrail Requirements When Setting 2024 Star Rating Cut Points

46.     In October 2023, CMS announced the results of its Star Rating calculations for 2024. In calculating its 2024 Star Ratings, CMS applied the Tukey outlier deletion methodology for the first time. But in determining cut points for the 2024 Star Ratings, CMS violated the guardrail requirement at 42 C.F.R. § 422.166(a)(2)(i), which, notwithstanding the application of the Tukey methodology, still requires CMS to apply a 5-percentage-point guardrail to certain measure cut points so that those cut points "do not increase or decrease more than the value of the cap from 1 year to the next."

47. Specifically, to determine cut points for the 2024 Star Ratings, CMS simulated the 2023 Star Rating cut points assuming it had applied Tukey, and then applied the guardrails to those *simulated* cut points instead of the *actual* 2023 cut points. *See Medicare 2024 Part C & D Star Ratings Technical Notes*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Nov. 8, 2023), at 157.

48. Indeed, as set forth in the Technical Notes published by CMS in conjunction with the 2024 Star Ratings, CMS explained:

> For the purposes of calculating the guardrails for the 2024 Star Ratings, the 2023 Star Ratings cut points were rerun including mean resampling, Tukey outlier deletion and no guardrails. These rerun 2023 Star Ratings cut points serve[d] as the basis for applying the guardrails for the 2024 Star Ratings . . . .

*Id.*

49. By eschewing the *actual* 2023 cut points for *simulated* 2023 cut points—and applying the guardrails to those *simulated* 2023 cut points—the cut points for 2024 Star Ratings increased by "more than the value of the [5-percentage point] cap from 1 year to the next" in direct violation of the plain regulatory language of 42 C.F.R. § 422.166(a)(2)(i).

50. CMS's actions not only violated the express language of the guardrail requirements in 42 C.F.R. § 422.166(a)(2)(i), but also run counter to the very purpose of the guardrails, which was to increase the predictability and stability of cut points from one year to the next. *See* 84 Fed. Reg. at 15757 (reflecting CMS's position in April 2019 that "the guardrails [were] a key component of how [it] intend[ed] the cut point methodology to provide stability and predictability from year to year, in balance with reflecting true performance" and that the guardrails would "lead to increased stability and predictability of cut points"); *see also* 87 Fed. Reg. at 79625 (reflecting CMS's December 2022 acknowledgment that, by adding guardrails to its Star Ratings methodology, "[t]he intent of th[e] change in methodology was to increase the predictability and stability of cut points").

21

51.     Instead of ensuring stability and predictability of cut points from one year to the next, CMS achieved the exact opposite result, causing destabilization of cut points from 2023 to 2024. Indeed, CMS's violation of the guardrails requirement had a significant impact on Star Ratings across the industry by causing overall Star Ratings to drop significantly and making it harder for contracts to improve or even maintain their Star Ratings. For instance, CMS has reported that only 42% of MA-PD contracts that will be offered in 2024 achieved an overall rating of 4 stars or higher, compared with approximately 51% of contracts in 2023. *See 2024 Medicare Advantage and Part D Star Ratings*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Oct. 13, 2023), https://www.cms.gov/newsroom/fact-sheets/2024-medicare-advantage-and-part-d-star-ratings. Weighted by enrollment, the average MA-PD Star Rating fell from 4.14 for 2023 to 4.04 for 2024. Likewise, the number of 5-Star plans fell from 57 in 2023 to 31 in 2024, causing enrollment in 5-Star plans to drop precipitously from 2023 to 2024. *Id.* Moreover, by applying guardrails to the *simulated* 2023 cut points instead of the *actual* 2023 cut points, CMS has artificially inflated the cut points this year, and those cut points will be utilized for purposes of applying guardrails in future years—thus compounding the problem on a going forward basis.

52.     Under the congressionally-mandated "Quality Bonus Payment" program, the Star Ratings that CMS assigns are a key factor in determining CMS's payments to MAOs in two ways and directly impact benefits that MAOs are able to offer to enrollees. *See* 42 U.S.C. § 1395w–23(o). Specifically, if an MAO's contract receives an overall Star Rating of 4 Stars or higher, the federal benchmark is raised 5% resulting in higher payments to the plans. In addition, the rebate amount that plans receive if their bid is below the benchmark is impacted by Star Ratings.

*Star Ratings Influence Enrollment In MAOs*

53.     In addition to their financial impact, Star Ratings also impact enrollment in MAOs. MAOs must recruit and retain enrollees through coordinated outreach and marketing efforts, designed to attract enrollees to pick their plan over competitors' plans. One purpose of Star Ratings is to allow enrollees to identify plans that are purportedly of higher quality relative to other choices. Plans with higher Star Ratings are at a significant advantage in these efforts. Indeed, CMS facilitates the plan selection process by maintaining a website known as the "Medicare Plan Finder," which is an online tool that displays information about available plans, including Star Ratings, to assist beneficiaries in choosing the coverage that is right for them. *See* 42 C.F.R. § 422.166(h). Further, MAOs that receive a 5-Star Rating may be afforded the opportunity to enroll members throughout the year, whereas lower rated plans generally cannot. This offers a significant marketing advantage to 5-Star plans.

54.     Moreover, CMS requires that MAOs provide Star Ratings information to beneficiaries through a standardized Star Ratings information document. The wide distribution of Star Ratings information increases the chances that beneficiaries will learn about and rely on Star Ratings and the low-performing icon, which CMS uses to flag plans it considers low performing, in making plan choices.

*Star Ratings Also Influence The Medicare Advantage Bid Process*

55.     As explained above, each year at the beginning of June, MAOs project their own expected costs for traditional Medicare benefits relative to the benchmark and submit those projections to CMS in the form of "bids" for the payment they require from CMS in the coming year. Since the Star Ratings system influences the revenue a plan expects to receive, knowing the

correct Star Rating directly impacts the bid and the services that a plan can ultimately afford to provide.

*Elevance's Star Ratings Fell As A Result Of The Improper Application Of Guardrails*

56.    CMS's actions in applying guardrails contrary to the regulatory requirements directly and proximately caused a negative impact on Plaintiffs' Star Ratings. Specifically, had CMS applied the guardrail requirement to the actual 2023 cut points instead of the simulated 2023 cut points, Plaintiffs would have received higher measure-specific Star Ratings for many measures and higher overall Star Ratings for several of its contracts.

57.    Indeed, while Elevance, through the Health Plan Plaintiffs, holds numerous Medicare contracts that had negative Stars impacts, three of its largest contracts fell below the 4-Star threshold after CMS improperly applied the guardrails, causing Elevance to lose out on hundreds of millions of dollars in Quality Bonus Payments and rebates.

*CMS Acted Arbitrarily And Capriciously In Connection*
*With Its Award Of Plaintiffs' 2024 Star Ratings For Quality Measure D01*

58.    Among the various quality measures CMS assessed in connection with its assignment of 2024 Star Ratings was quality measure D01 (Part D Call Center-Foreign Language Interpreter and TTY Availability).[1] *See Medicare 2024 Part C & D Star Ratings Technical Notes*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Nov. 8, 2023), at 85-86.

59.    To measure D01 scores, CMS conducts "secret shopper" calls to plans. According to CMS guidance, quality measure D01 considers the "[p]ercent of time that TTY services and foreign language interpretation were available when needed by people who called the [prescription] drug plan's prospective enrollee customer service line." *Id.* at 85.

---

[1]    A related individual measure is C30 (Part C Call Center – Foreign Language and TTY Availability).

60.     For the 2024 Star Ratings, CMS described the calculation by which it assessed quality measure D01 as follows:

> The calculation of this measure is the number of completed contacts with the interpreter and TTY divided by the number of attempted contacts. Completed contact with an interpreter is defined as establishing contact with an interpreter and confirming that the customer service representative can answer questions about the plan's Medicare Part D benefit within eight minutes. Completed TTY contact is defined as establishing contact with and confirming that the customer service representative can answer questions about the plan's Medicare Part D benefit within seven minutes.

*Id.*

61.     TTY, a telecommunication relay services often used by the deaf or hard of hearing, is a public service mandated by federal law to be available by all common carriers to hearing and speech impaired individuals throughout the United States. 47 U.S.C. § 225.

62.     For 2024 Star Ratings on quality measure D01, CMS set the 5-Star cut point for MA-PDs at a success rate of 99%--meaning that plans could only achieve a 5-Star score for quality measure D01 if 99% or more of CMS's secret shopper calls were counted as successful. *Medicare 2024 Part C & D Star Ratings Technical Notes*, CENTERS FOR MEDICARE & MEDICAID SERVICES (Nov. 8, 2023), at 154.

63.     CMS's cut-point determination and decisions related to the D01 quality measure for 2024 Star Ratings were arbitrary and capricious as applied to Elevance and contrary to applicable law for several reasons.

64.     First, the 99% cut point for a 5-Star score on measure D01 was not an attainable score. CMS set the 5-Star cut point at 99% based upon its statistical modeling. In conducting secret shopper calls and calculating the contract-specific scores for the Health Plan Plaintiffs, CMS counted 61, 62, 63, or 64 calls (depending on the contract) in the denominator for the Health Plan Plaintiffs' plans that CMS assessed. Of those calls, CMS attributed only 1 missed call to the Health

Plan Plaintiffs—meaning that the Health Plan Plaintiffs had a success rate of 98.4 percent. But because CMS used samples of only 61, 62, 63, or 64 calls, it was mathematically impossible to achieve a 99% score. Rather, because success rates of 60/61, 61/62, 62/63, or 63/64 equate to 98.4%, only a perfect score would achieve a 5-Star rating. Setting a success rate that is impossible to achieve is arbitrary and capricious.

65.     Second, CMS's methodology failed to account for the fact that the Health Plan Plaintiffs' actual results on quality measure D01 were statistically equivalent to meeting the 99% measure given CMS's sampling methodology. With samples as small as 61, 62, 63, or 64 calls, missing only a single call is the statistical equivalent of a 99% cut-point score. Specifically, when conducting any sampling, sampling error needs to be accounted for.

66.     Nevertheless, because CMS attributed 1 missed call to the Health Plan Plaintiffs, CMS awarded 4 Stars, as opposed to 5 Stars, on measure D01 for each of the Health Plan Plaintiffs. However, CMS's methodology for calculating plan scores for D01 generally, and Plaintiffs' scores specifically, did not account for sampling error, which was arbitrary and capricious.

67.     Third, in addition to the fact that CMS's methodology for calculating the cut point for D01 is arbitrary and capricious, there is no evidence that the single call CMS attributed as a missed call to Elevance ever connected with Elevance's call center. Plaintiffs use a consolidated call center that handles calls for each of the Elevance Plaintiffs. Plaintiffs also use 7-1-1 and its relay operators for purposes of connecting TTY calls.

68.     As noted above, TTY is a public service mandated by federal law to be available by all common carriers to hearing and speech impaired individuals throughout the United States. 47 U.S.C. § 225. To implement this mandate, in 2000, the Federal Communications Commission ("FCC") implemented federal regulations to create 7-1-1, a free nationwide telecommunications

relay service that uses operators to serve as intermediaries between hearing or speech impaired individuals using a text telephone and people who use standard voice telephones. *See* 47 C.F.R § 64.603 (2019). The FCC mandated the 7-1-1 system to "encourage and facilitate communication among individuals who are deaf, hard of hearing, or have speech disabilities and voice users . . . [and] expect[ed] the new rules to spur greater demand for quality relay service by text and voice users." FEDERAL COMMUNICATIONS COMMISSION, 00-257, CC Doc. No. 92-105, at 4 (Aug. 9, 2000). Thus, the very purpose of 7-1-1 is to allow consumers to utilize relay services to connect with people and businesses like Elevance.

69.     According to CMS call data, a CMS caller attempted to access the Elevance call center via a TTY exchange operator through the nationwide 7-1-1 service on March 23, 2023 at 12:20:47 ET. The CMS call notes state: "Connected with TTY operator and type (busy) then asked for number to dialed. I type number but while I was typing the number TTY operator type something, then I type the complete number again and waited, then the TTY dialed window closed. TTY operator got disconnected before dialed the plan."

70.     Elevance call center data confirms that the call never connected to the Elevance call center at or around March 23, 2023 at 12:20:47 ET. In fact, the Elevance call center cannot find any call that would match the description of the CMS call data, which is entirely consistent with CMS's own statement that the "dialer window closed before TTY operator dialed the plan."

71.     Notwithstanding those facts and despite all demonstrated evidence suggesting that the call failed to connect due to a technical error attributable to the CMS caller, the TTY operator, or a combination of the CMS caller not fully connecting with the TTY operator, CMS considered the call unsuccessful *and attributable to a failure of Plaintiffs*.

72. Notwithstanding the fact that 7-1-1- is a federally-mandated program and Plaintiffs have no oversight or control of the 7-1-1 operators, CMS has issued informal guidance stating that it considers a TTY call to have "connected" when the caller reaches a TTY relay operator. *See 2022 Part C and Part D Call Center Monitoring – Timeliness and Accuracy &Accessibility Studies*, CENTERS FOR MEDICARE & MEDICAID SERVICES, at 2 (2021). This guidance is not supported by the applicable Medicare statutes or regulations, and is contrary to the express position of the FCC which considers simply reaching the TTY relay operator to be "functionally equivalent to receiving a 'dial tone.'" FCC 00-257 at n. 2. In other words, the FCC does not consider reaching the TTY operator to be a connection to the ultimate recipient, which in this case is the Health Plan Plaintiffs, making CMS's position contrary to the FCC's interpretation of the statutes and regulations that it has enforcement authority over.

73. CMS has also stated that it considers 7-1-1 operators "to be an agent of the plan." *Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes*, CENTERS FOR MEDICARE & MEDICAID SERVICES, at 20. According to CMS guidance, when 7-1-1 is used, "if we disconnect the line with the relay operator, we will not count the outcome of the call in the plan's performance. [But if] the relay operator disconnects the call or refused to wait the entire seven minutes in use for the TTY hold time, CMS views this the same as if the plan had disconnected the call or hung up because CMS views the relay operator as an agent of the plan, by extension." *Id.* at 20-21.

74. However, 7-1-1 is not, and its operators are not, agents of Plaintiffs or any other MAO. Companies like Plaintiffs do not contract with 7-1-1; rather, it is a free service mandated by federal law that is available to all people and companies—akin to 9-1-1. Furthermore, Plaintiffs have no control over the 7-1-1 TTY system or the operators. To the contrary, the Federal

Communications Commission regulates the services and pays for the services through government funds. Lest there be any doubt, in its rulemaking codifying the call center TTY requirements, CMS acknowledged that Medicare Advantage plans have no authority or control over federal and state relay systems established by federal law such as 7-1-1. *See* 86 Fed. Reg. 5864, 6008 (Jan. 19, 2021).

75.     Penalizing Plaintiffs for a call that was made through a federally-mandated public TTY service that never touched its phone system is arbitrary and capricious, is contrary to law, and does nothing to advance CMS's objectives of plan accessibility. Further, Defendants' guidance and action in interpretating a state actor to be an agent of Plaintiffs is arbitrary and capricious, beyond the agency's authority, contrary to law, and an impermissible rulemaking in light of the informal guidance it was issued under.

76.     Plaintiffs estimate that this *single missed call* had an approximate $190 million impact on Plaintiffs' Quality Bonus Payments. Specifically, Plaintiffs had four contracts that missed an overall 4-Star Rating, which would have allowed them to qualify for Quality Bonus Payments—directly and proximately as a result of this single missed call. Moreover, upon information and belief, there were other MAOs that suffered the same fate as Plaintiffs by having TTY calls that never connected to their system counted against the plan.

77.     Plaintiffs have submitted reconsideration requests to CMS for contracts H2593, H4036, H5431, and R4487 with respect to CMS's calculation of the D01 measure score through the informal process available at 42 C.F.R. § 422.260. However, that process is insufficient to address the issues that Plaintiffs challenge because, among other reasons, CMS has made clear that "administrative review [under 42 C.F.R. § 422.260] cannot be requested for the following:  the methodology for calculating the [S]tar [R]atings (including the calculation of the overall [S]tar

[R]atings); cut-off points for determining measure thresholds; the set of measures included in the star rating system; and the methodology for determining [Quality Bonus Payment] determinations for low enrollment contracts and new MA plans." 42 C.F.R. § 422.260(c)(3)(ii).

78.     Indeed, the Medicare Appeals Process further allows that "CMS may limit the measures or bases for which a contract may request an administrative review of its [Quality Bonus Payment] status." *See* 42 C.F.R. § 422.260(c)(3)(i). And in its instructions, CMS has emphasized that appeals are for limited purposes. As such, CMS has made the informal review process unavailable to all Plaintiffs who have suffered a negative effect of the process.

79.     Further, the measure cut points, means resampling, statistical significance and CMS's improper determination to deem a state actor as an independent contractor of Plaintiffs, all strike at the heart of the methodology considerations of the MA Star rankings. As such, these issues are completely exempt from the informal process under 42 C.F.R. § 422.260, and continuing to wait for a decision on reconsideration will be futile.[2]

### CLAIMS FOR RELIEF

#### *First Claim For Relief*

*(Violation of Administrative Procedure Act – Agency Action Not In Accordance With Law)*

80.     Plaintiffs incorporate the Paragraphs 1 through 79 of this Complaint as if set forth fully herein.

81.     The APA, 5 U.S.C. §§ 551-559 and 701-706, provides for judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702. Under 5 U.S.C. § 706(2)(A), an agency action can be held unlawful and set aside if it is "not in accordance with law."

---

[2]     Furthermore, at the end of its reconsideration request, Plaintiffs reserved its rights to bring challenges around the methodology employed in assessing the MA Star Ratings.

82. CMS is responsible for administering the Medicare program, including the Medicare Star rating system.

83. Under 42 C.F.R. § 422.166(a)(2), CMS is required to apply a 5-percentage-point guardrail to certain measure cut points so that those cut points "do not increase or decrease more than the value of the cap from [one] year to the next."

84. In October 2023 (for 2024 Star Ratings), CMS applied for the first time the Tukey outlier deletion methodology the Star Ratings that it assigned to MAOs. But to determine cut points for 2024 Star ratings, CMS simulated the 2023 Star rating cut points assuming it applied Tukey, and then applied the guardrails to those simulated cut points instead of the actual 2023 cut points.

85. As a result of the simulated cut points and the application of guardrails, the cut points increased by more than 5 percentage points from one year to the next—in violation of the plain regulatory language of 42 C.F.R. § 422.166(a)(2).

86. Accordingly, CMS has acted contrary to law and failed to follow its own rules.

87. Plaintiffs were adversely affected as a direct result of CMS's actions.

88. Plaintiffs therefore respectfully request the relief as prayed for below.

### ***Second Claim For Relief***

*(Violation of Administrative Procedure Act – Arbitrary and Capricious Agency Action and Contrary to Law)*

89. Plaintiffs incorporate Paragraphs 1 through 79 of this Complaint as if set forth fully herein.

90. Under 5 U.S.C. § 706(2)(A), an agency action can be held unlawful and set aside if it is arbitrary or capricious.

91. CMS's cut-point determination and decisions related to the D01 (Call Center—Foreign Language Interpreter and TTY Availability) quality measure for 2024 Star Ratings were arbitrary and capricious as applied to Plaintiffs for two independent reasons.

92. First, CMS set the 5-Star cut point for the D01 measure at 99%, but in conducting secret shopper calls and calculating contract-specific scores for Plaintiffs, CMS included only 61, 62, 63, or 64 calls as the denominator, thereby making it mathematically impossible for Plaintiffs to reach the 99% cut point with anything less than a perfect score. Furthermore, despite attributing only 1 missed call to Plaintiffs, CMS miscalculated Plaintiffs' scores by failing to acknowledge that a success rate of 60/61, 61/62, 62/63, or 63/64 calls—scores which CMS found Plaintiffs achieved—is statistically equivalent to a 99% cut point due to sampling error.

93. Second, CMS arbitrarily and capriciously included one TTY call that never connected to Plaintiffs' call center in the denominator of the D01 measure for certain contracts. Specifically, CMS call center data shows that a CMS caller attempted to access the Plaintiffs' call center via a TTY exchange operator through the nationwide 7-1-1 service on March 23, 2023 at 12:20:47 ET. But no call connected to the call center at or around March 23, 2023 at 12:20:47 ET. Notwithstanding that fact, CMS considered that call as an unsuccessful call, resulting in Plaintiffs' receiving a success rate score of 98.4% and CMS's determination that Plaintiffs did not meet the 99% cut point for 5 stars this measure.

94. Furthermore, to the extent that CMS is arbitrarily deeming a state actor to be an agent of Plaintiffs, CMS's actions are contrary to law and arbitrary and capricious.

95. Accordingly, CMS's cut-point determination and decisions related to the D01 quality measure for 2024 Star Ratings was arbitrary and capricious as applied to Plaintiffs.

96.     Plaintiffs were adversely affected as a direct result of CMS's actions, which prevented Plaintiffs from meeting the 5-star cut point for measure D01.

97.     By awarding Plaintiffs 4 (and not 5) Stars on quality measure D01, this caused Plaintiffs' overall contract scores to be 4 (and not 5) stars for their 2024 Star Rating.

98.     This had an approximately $190 million impact on Plaintiffs.

99.     Plaintiffs therefore respectfully request the relief as prayed for below.

### *Third Claim For Relief*

### *(Declaratory Judgment)*

100.     Plaintiffs incorporate Paragraphs 1-79 of this Complaint as if set forth fully herein.

101.     CMS's calculation of the 2024 Star Ratings is a final agency action made reviewable by 5 U.S.C. § 706(2).

102.     Plaintiffs are adversely affected and harmed by the calculation of their Star Ratings.

103.     An actual controversy has arisen and exists between the Plaintiffs and Defendants regarding Defendants' calculation of Plaintiffs' 2024 Star Ratings when CMS failed to follow its regulations requiring guardrails be applied to the actual cut points and incorporating a call that never even reached the Plaintiffs' call center in calculating Plaintiffs' scores.

104.     Plaintiffs request a declaration from this Court under 28 U.S.C. § 2201 that Defendants' calculation is arbitrary and capricious.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to:

A.     Enter judgment against Defendants and in favor of Plaintiffs for each count alleged in this Complaint;

B.     Declare that by creating 2024 Star Rating cut points that were more than 5 percentage points higher than the actual 2023 cut points, Defendants violated the guardrail

requirements set forth at 42 C.F.R. § 422.166(a)(2) and order Defendants to recalculate Plaintiffs' Star Ratings by using actual 2023 Star Ratings.

      C.     Declare that Defendants' decision that Plaintiffs did not meet the 99% cut point for the D01 measure for the contracts identified in Paragraph 6 is arbitrary and capricious and contrary to law, set aside Defendants' determination that Plaintiffs scored only a 4 on measure D01 and find that the Plaintiffs have met the criteria to score a 5 on the D01 measure (and any other measure impacted by Defendants' improper conclusion regarding the single TTY call) and order Defendants to re-calculate Plaintiffs' Star Ratings accordingly.

      D.     Set aside Defendants' Quality Bonus Payment determination as to Plaintiffs and re-determine Plaintiffs' eligibility for Quality Bonus Payments.

      E.     Grant such other and further relief as the Court deemed just and proper.


Dated: December 29, 2023            Respectfully submitted,

                                    **ELEVANCE HEALTH, INC. and the HEALTH PLAN PLAINTIFFS**

                                    By: */s/ Lesley C. Reynolds*

                                    Lesley C. Reynolds (D.C. Bar No. 487580)
Lara E. Parkin (D.C. Bar No. 475974)
REED SMITH LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
(202) 414-9200
lreynolds@reedsmith.com
lparkin@reedsmith.com

Martin J. Bishop (*pro hac vice forthcoming*)
Steven D. Hamilton (*pro hac vice forthcoming*)
REED SMITH LLP
10 South Wacker Drive
40th Floor

Chicago, IL 60606
(312) 207-1000
mbishop@reedsmith.com
shamilton@reedsmith.com

*Counsel for Plaintiffs*