# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

UNITEDHEALTHCARE BENEFITS OF
TEXAS, INC., et al.,

     *Plaintiffs,*

  v.

CENTERS FOR MEDICARE & MEDICAID
SERVICES, et al.,


     *Defendants.*

Civil Action No. 6:24-cv-00357-JDK

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………….    1

BACKGROUND…………………………………………………………………...    3

A.  Medicare Advantage Program…………………………………………………..    3

B.  Medicare Part C and D Quality Star Rating System……………….……………    4

C.  Call Center Foreign Language Interpreter and TTY Availability Measure……..……...    7

D.  Appeals Process for Star Ratings……………………………………….……………    9

STANDARD OF REVIEW…………………………………………………………    10

ARGUMENT………………………………………………………………………..    12

I.    CMS'S DETERMINATION THAT THE CALL WAS UNSUCCESSFUL
      WAS FULLY CONSISTENT WITH ITS PUBLISHED
      PROTOCOL……...……….....................................................................................    12

II.   CMS DID NOT TREAT PLAINTIFFS DIFFERENTLY THAN OTHER
      SIMILARLY SITUATED PLANS……………………………………………    16

III.  CMS PROVIDED PLAINTIFFS WITH AN EXPLANATION OF ITS DECISION
      ON MULTIPLE OCCASIONS DESPITE PLAINTIFFS' SHIFTING
      THEORIES…..................................................................................................    18

IV.  CMS DID NOT IMPROPERLY SUBDELEGATE ITS DECISION
      HERE………………………………………………………………………...    23

CONCLUSION……………………………………………………………….........    24

# TABLE OF AUTHORITIES

Page(s)

Cases

*Ala. Med. Ctr. v. Sebelius*,
  572 F.3d 912 (D.C. Cir. 2009) ............................................................ 10
*Amerijet Int'l, Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014) .......................................................... 18
*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) .......................................................................... 18
*Cal. Communities Against Toxics v. EPA*,
  928 F.3d 1041 (D.C. Cir. 2019) .......................................................... 16
*Camp v. Pitts*,
  411 U.S. 138 (1973) ............................................... 18, 19, 20, 21
*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971) .......................................................................... 11
*City of South Bend v. Surface Transp. Bd.*,
  566 F.3d 1166 (D.C. Cir. 2009) .......................................................... 11
*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ................................................................... 11, 12
*County of Los Angeles v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999) .......................................................... 10
*Ctr. for Food Safety v. Salazar*,
  898 F. Supp. 2d 130 (D.D.C. 2012) .................................................... 11
*Dist. Hosp. Partners, L.P. v. Burwell*,
  786 F.3d 46 (D.C. Cir. 2015) ............................................................. 11
*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) .......................................................................... 18
*Garland v. Ming Dai*,
  593 U.S. 357 (2021) .......................................................................... 18
*Gentiva Healthcare Corp. v. Sebelius*,
  857 F. Supp. 2d 1 (D.D.C. 2012) ....................................................... 10
*Int'l Dark-Sky Ass'n, Inc. v. FCC*,
  106 F.4th 1206 (D.C. Cir. 2024) ......................................................... 23
*LeMoyne-Owen College v. N.L.R.B.*,
  357 F.3d 55 (D.C. Cir. 2004) .................................................. 22, 23, 24
*Louisiana Env't Action Network v. EPA*,
  382 F.3d 575 (5th Cir. 2004) ............................................................. 15
*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) .......................................................................... 11
*Methodist Hosp. of Sacramento v. Shalala*,
  38 F.3d 1225 (D.C. Cir. 1994) ........................................................... 11
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................... 11, 18

*Pension Ben. Guar. Corp. v. Wilson N. Jones Mem. Hosp.*,
  374 F.3d 362 (5th Cir. 2004) ...................................................................... 18
*Petal Gas Storage, L.L.C., v. FERC*,
  496 F.3d 695 (D.C. Cir. 2007) .................................................................... 11
*PPG Indus., Inc. v. United States*,
  52 F.3d 363 (D.C. Cir. 1995) ...................................................................... 10
*Prairie Band Potawatomi Nation v. Yellen*,
  63 F.4th 42 (D.C. Cir. 2023) ....................................................................... 17
*SEC v. Fed. Lab. Rels. Auth.*,
  568 F.3d 990 (D.C. Cir. 2009) ............................................................... 12, 13
*Sierra Club v. Sigler*,
  695 F.2d 957 (5th Cir. 1983) ....................................................................... 24
*U.S. Telecom Ass'n v. FCC*,
  359 F.3d 554 (D.C. Cir. 2004) .............................................................. 23, 24
*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952) ...................................................................................... 15


Statutes

5 U.S.C. § 706 ................................................................................................. 10
5 U.S.C. § 706(2)(A) ........................................................................................ 11
42 U.S.C. § 1395 ............................................................................................... 3
42 U.S.C. § 1395c .............................................................................................. 3
42 U.S.C. § 1395w-21 .................................................................................... 3, 4
42 U.S.C. § 1395w-23(b)(2) ............................................................................... 7
42 U.S.C. § 1395w-23(o)(1) ............................................................................... 6
42 U.S.C. § 1395w-24(b)(1)(C) ...................................................................... 4, 6
42 U.S.C. § 1395w-24(b)(1)(C)(v) ..................................................................... 7
42 U.S.C. §§ 1395j, 1395k, 1395l ...................................................................... 3
42 U.S.C. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A) ................................... 4
§ 1395w-23(o)(3)(A)(i) ..................................................................................... 6


Regulations

42 C.F.R. § 422.164(c), (d) ................................................................................ 7
42 C.F.R. § 422.166(h)(2) .................................................................................. 9
42 C.F.R. § 422.254 ........................................................................................... 4
42 C.F.R. § 422.258 ........................................................................................... 4
42 C.F.R. § 422.260 ........................................................................................ 4, 6
42 C.F.R. § 422.260(a) ..................................................................................... 10
42 C.F.R. § 422.266(a)(2)(ii) (same) ................................................................. 7
42 C.F.R. §§ 422.162(b) ..................................................................................... 6
Contract Year 2019 Policy & Technical Changes to the MA Program,
  83 Fed. Reg. 16,440 (Apr. 16, 2018) ......................................................... 5, 6

**INTRODUCTION**

This lawsuit concerns the Medicare Part C and D Quality Star Rating system, which allows Medicare beneficiaries to comparison shop among hundreds of available private health insurance companies offering Part C and Part D benefit plans.  Mandated by Congress and implemented by the Centers for Medicare & Medicaid Services ("CMS"), the Star Ratings system rates health plans on dozens of measures of health outcomes, health care processes, patient experience, and other plan performance measures based on health records, CMS administrative data, and survey data collected from millions of Medicare beneficiaries covered under these plans.  Each October, CMS publishes the Star Ratings, which assign to each health plan a score from 1- to 5-stars on each performance measure and provides an overall rating that is a weighted average of the plan contract's scores on the various individual measures.

Plaintiffs, seven health insurance companies that provide Medicare Advantage plans to Medicare beneficiaries, disagree with the Star Ratings they received this October.  They seek to increase their ratings by challenging their score on a particular performance measure known as "Call Center–Foreign Language Interpreter and TTY Availability."  The measure assesses how well a health plan's call center processes calls from enrollees who have limited English language proficiency or hearing or speech disabilities.  Each year, CMS assesses performance on this measure by conducting about 60 anonymous test calls to each call center.  During those calls, the call center must connect the test caller ("caller" or "interviewer") within a set time to a customer service representative ("CSR") who can answer—with an interpreter if necessary—a standard question posed in one of six common foreign languages spoken in the United States or by a teletypewriter ("TTY") text system.

Because each of these Plaintiffs chose to use the same call center, each of their Star Ratings is based, in part, on the performance of that one call center.  Plaintiffs seek to invalidate one of the

1

48 foreign-language test calls this call center received during the evaluation period.  (The call center also received 16 TTY test calls during this period for a total of 64 test calls.)  If they are successful, it would increase their score on this performance measure and their overall Star Ratings.  CMS deemed the challenged call unsuccessful because the interviewer was unable to engage a customer service representative before the call center disconnected the call.  The record shows that the interviewer dialed the correct number for the call center, heard an automated Interactive Voice Response system that presented a menu of options, including pressing 6 to continue in French, and selected the number 6.  At that point, the caller should have heard a customer service representative introduce themselves.  This time though, the caller heard a brief sound—perhaps a fragment of a word—for a split second and then silence.  The caller responded, "hello" or "allô," but hearing nothing in response, continued to wait on the line believing he was on hold.  The call center happened to record the call, and at no point during the recording can anyone from the call center be clearly heard.  After about 8 minutes, the call center disconnected the call.  All of this is clear from Plaintiffs' own audio recording of the call—which is available for the Court to hear for itself.

At the administrative level, Plaintiffs challenged the call arguing, first, that it should be invalidated due to audio issues on the caller's side.  Plaintiffs claimed that their customer service representative had spoken French to the caller, heard a "hello," and then no audio from the caller side showing an audio issue with the caller's equipment or connection.  When Plaintiffs' recording emerged, however, they changed their tune and began arguing that the caller did not follow proper protocol because he did not ask the proper introductory question.  CMS rejected this argument, finding that Plaintiffs' own recording confirmed that at no point during the call did a customer service representative ever engage the interviewer.

Plaintiffs filed this lawsuit arguing that CMS's decision to include the call in the call center performance measure was arbitrary and capricious.  But the record here shows that CMS's decision was fully consistent with the agency's published guidance, that CMS did not treat Plaintiffs differently than other similarly situated plans, and that CMS provided Plaintiffs with a sufficiently reasoned explanation of its decision on multiple occasions despite Plaintiffs' shifting theories.

## BACKGROUND

### A.    Medicare Advantage Program

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. ("Medicare statute"), establishes the Medicare program, a federally funded and administered health insurance program for eligible elderly and disabled persons and certain individuals with end stage renal disease.  *See* 42 U.S.C. § 1395c.  The Secretary administers the Medicare program through CMS, a component agency of the United States Department of Health and Human Services.

The Medicare program is divided into four major components.  Part A, the hospital insurance benefit program, provides health insurance coverage for certain inpatient hospital care, post-hospital care in a skilled facility, post-hospital home care services, and other related services.  *See* 42 U.S.C. §§ 1395c, 1395d.  Part B, the supplemental medical insurance benefit program, generally pays for a percentage of certain medical and other health services, including physician services, supplemental to the benefits provided by Part A.  *See* 42 U.S.C. §§ 1395j, 1395k, 1395l.  Under Part C, the Medicare Advantage program, a Medicare beneficiary can elect to receive his or her Medicare benefits through a public or private healthcare plan.  *See* 42 U.S.C. § 1395w-21 *et seq*.  Finally, Part D is the voluntary prescription drug benefit program.

This case primarily concerns the Medicare Advantage program under which the federal government pays health insurance companies to provide the coverage that participating beneficiaries would otherwise receive through Parts A and B (sometimes known, collectively, as

"traditional" Medicare).  *Id.* § 1395w-22(a).  These insurers, known as Medicare Advantage Organizations ("MAOs"), contract to provide coverage in a particular geographic area. Beneficiaries can then choose among the plans available where they reside.  *Id.* § 1395w-21(b). MAOs receive a predetermined sum for providing coverage to each beneficiary, based in part on the demographic and health characteristics of that beneficiary.  *Id.* § 1395w-23(a)(1)(A), (C).

To calculate payments to MAOs, CMS first determines a "benchmark," based on the per capita cost of covering Medicare beneficiaries under Parts A and B in the relevant geographic area. *Id.* § 1395w-23(n); 42 C.F.R. § 422.258.  Each MAO then submits a "bid," telling CMS what payment the MAO will accept to cover a beneficiary with an average risk profile in that area. 42 C.F.R. § 422.254.  If the insurer's bid is less than the benchmark, the bid becomes the insurer's "base payment"—the amount it is paid for covering a beneficiary of average risk—and the insurer also receives a portion of the amount by which its bid is lower than the benchmark as a "rebate" that the MAO can use to fund supplemental benefits for beneficiaries or reduce plan premiums. 42 U.S.C. § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.  If the MAO's bid is greater than the benchmark, then the benchmark becomes the insurer's base payment, and the insurer must charge beneficiaries a premium to make up the difference.  *See* 42 U.S.C. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A).

## B.    Medicare Part C and D Quality Star Rating System

To provide beneficiaries with information on the quality of Medicare Advantage plans, CMS uses a Star Ratings system that rates each plan on a scale from 1 to 5 "stars" based on 30 or 42 quality measures, depending on whether the plan is MA-only or also includes Part D coverage. CMS, Medicare 2025 Part C & D Star Ratings Technical Notes 13 (updated Oct. 23, 2024), *available at* https://www.cms.gov/medicare/health-drug-plans/part-c-d-performance-data.  These

quality measures relate to different aspects of health outcomes, patient experience, and care quality within the following five broad categories:

- Outcome measures that reflect improvements in a beneficiary's health and that are central to assessing quality of care;

- Intermediate outcomes that reflect actions taken which can assist in improving a beneficiary's health status, such as control of blood sugar in diabetes care where the related outcome of interest would be better health status for beneficiaries with diabetes;

- Patient experience measures that reflect beneficiaries' perspectives on the care they receive from a plan;

- Access measures that reflect processes and issues that could create barriers to receiving needed care, such as whether a plan makes timely decisions about benefit appeals; and

- Process measures that capture the health care services provided to beneficiaries which can assist in maintaining, monitoring, or improving their health status.

*Id*. at 9.

To calculate these ratings measures, CMS uses a variety of different data sources, including administrative and medical record review data collected as part of the Healthcare Effectiveness Data and Information Set ("HEDIS"), survey-based data from the Health Outcomes Survey and from the Consumer Assessment of Healthcare Providers and Systems ("CAHPS"), and CMS performance measures such as the call center measures. Contract Year 2019 Policy & Technical Changes to the MA Program, 83 Fed. Reg. 16,440, 16,520, 16,525 (Apr. 16, 2018). For measures not based on information from CAHPS, CMS uses a clustering algorithm that creates four "cut points" in the data to separate plans into five different "star" levels. *See* 2025 Star Ratings Technical Notes at 17. CMS determines each plan's overall rating by calculating a weighted average of the plan's Star Ratings on each of the different individual measures. *Id*. at 20-21.

CMS began releasing Star Ratings for Medicare Advantage contracts in 2008. *See* 83 Fed. Reg. at 16,520. CMS publishes the Star Ratings each October for the upcoming year at the contract

level, with each plan offered under that contract assigned the contract's rating.  *See* 42 C.F.R. §§ 422.162(b); 422.66; 423.182(b); and 423.186.  This case concerns the 2025 Star Ratings issued in October 2024.  CMS, Fact Sheet - 2025 Medicare Advantage and Part D Star Ratings (Oct. 10, 2024), *available at* https://www.cms.gov/medicare/health-drug-plans/part-c-d-performance-data.

The Star Ratings system is intended to assist beneficiaries in finding the best MA and Part D plans for their needs by providing information "that is a true reflection of the plan's quality and encompasses multiple dimensions of high quality care."  83 Fed. Reg. at 16,520; *see also* Advance Notice of Methodological Changes for Calendar Year ("CY") 2025 for MA Capitation Rates and Part C and Part D Payment Policies, at 111 (Jan. 31, 2024), *available at* www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Announcements-and-Documents.

Star Ratings do more than provide valuable information to beneficiaries when selecting an MAO.  Congress has provided that a plan contract's overall Star Rating should also affect payments to the MAO in two ways.  First, plans that earn an overall rating of 4 stars or higher qualify for Medicare Advantage Quality Bonus Payments in the form of an increased benchmark for the contract year following the ratings year (*e.g.*, the 2025 Star Ratings can increase the MA bidding benchmarks for contract year 2026).  *See* 42 U.S.C. § 1395w-23(o)(1) (increasing, for qualifying plans, the applicable percentage that calculates the benchmark); § 1395w-23(o)(3)(A)(i) (a qualifying plan is one that earns a rating of 4 stars or higher).  This in turn can allow a MA plan to increase its bid, receive higher rebates, or lower premiums.  *See id.* § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.

Second, Star Ratings affect the level of rebate received by plans that bid below their benchmarks for the contract year following the ratings year (*e.g.*, the 2025 Star Ratings are used to set plans' rebate percentages for contract year 2026).  Plans that earn an overall rating of 4.5

stars or higher receive a rebate of 70% of the amount by which their bid is lower than the benchmark, while plans that earn 3.5 or 4 stars receive a rebate of 65% of that amount, and plans that earn less than 3.5 stars are eligible for a rebate of 50% of that amount.  42 U.S.C. § 1395w-24(b)(1)(C)(v) (listing the "final applicable rebate percentage[s]" by rating); 42 C.F.R. § 422.266(a)(2)(ii) (same).

Each year, CMS circulates to plans (and displays on its website) Technical Notes that provide details about the current year's Part C & D Star Ratings.  *See 2025 Star Ratings Technical Notes*.  Among other things, these Technical Notes include details about the measures that comprise the Star Ratings, how those measures will be weighted, what the cut points for each measure are, and how CMS assesses each measure.  *See generally id*.  Plans are informed about the measures in upcoming Star Ratings through the rulemaking process and the Advanced Notice process.  *See* 42 C.F.R. § 422.164(c), (d); *see also* 42 U.S.C. § 1395w-23(b)(2).

### C.    Call Center Foreign Language Interpreter and TTY Availability Measure

Since 2016, CMS has included as one of the performance measures in its Star Ratings a measure of how well health plan call centers process calls from beneficiaries with limited English language proficiency or a hearing or speech disability.  *See* Medicare 2016 Part C & D Star Rating Technical Notes, First Plan Preview at 54-55, *available at* https://www.cms.gov/Medicare/Prescription-Drug-coverage/PrescriptionDrugCovGenIn/%20/2016-Technical-Notes-Preview-1-v2015_08_05.pdf.  CMS provides notice to MAOs about how it evaluates performance on this measure for purposes of the Star Ratings.  For example, CMS publishes the Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes (hereinafter, "Technical Notes"), which explain how the study will be conducted and how CMS will use the results to calculate each plan contract's raw score on the measure.  *See* Administrative Record (hereinafter "AR") at 1-32.

The Technical Notes explain that the study is conducted through a random sample of anonymous calls made to each health plan's designated call center where the interviewer has no advance knowledge of the call center's Limited English Proficiency (LEP) or TTY services.  AR3.  The Technical Notes also describe the protocol for conducting and measuring calls testing foreign language interpreter accessibility:

> The interpreter availability/LEP measure may have a connected, complete, or unsuccessful outcome.  If we are testing interpreter availability, we place the call in a foreign language and wait for the CSR to bring an interpreter to the phone to assist the CSR in answering our introductory question.  We permit eight minutes for the CSR to connect to an interpreter and answer our introductory question. An example of an introductory question is, "Are you the right person to answer questions about [Plan name's] health benefits?"  The call is considered connected when the caller connects with the CSR.  The interpreter availability/LEP measure is considered completed when the CSR, via an interpreter, provides an affirmative response to the introductory question . . . within eight minutes.  Alternatively, if a CSR happens to speak the foreign language we are testing, and that representative is able to answer the questions without an interpreter's assistance, this too would count as a completed interpreter availability/LEP measure outcome.  In order for the interpreter availability/LEP measure to be complete, there must be true communication, meaning the CSR must answer the introductory question and be able to converse in the foreign language we are testing with or without an interpreter's assistance.

AR6.  A call "will be scored as unsuccessful if we are not able to connect to a live CSR at the plan during that scheduled call or if the CSR cannot assist us with our questions or cannot forward our call to someone who can assist."  AR5.

The Technical Notes note that scores on interpreter availability are combined with scores on TTY functionality for Star Ratings purposes.  AR4.  The raw score is calculated as "the number of completed contacts with the interpreter and TTY divided by the number of attempted contacts. Completed contact with an interpreter is defined as establishing contact with an interpreter and confirming that the customer service representative can answer questions about the plan's . . . benefit within eight minutes."  AR10.

In addition, CMS publishes annually a memorandum providing further guidance on how CMS monitors call center performance and how MAOs can prepare for the monitoring study. AR33-42.  For the year in question, the memorandum explained that the foreign languages being tested in 2024 were unchanged from the prior year and would include Spanish, Cantonese, Mandarin, Vietnamese, French, and Tagalog.  AR33-34.  The memorandum reiterated that "[i]nterpreter availability is defined as the ability of a caller to communicate with someone and receive answers to questions in the caller's language," and that "[i]nterpreters must be able to communicate responses to the call surveyor in the call center's non-primary language about the plan sponsor's Medicare or Medicare-Medicaid benefits."  AR34.  The memorandum also notifies MAOs that "[i]n the event that an organization believes that CMS may have miscalculated its call center results . . . , it may bring the relevant information to CMS' attention and ask for a review of the results."  AR34.

### D.    Appeals Process for Star Ratings

CMS provides for two plan preview periods before the annual release of each Star Ratings in October.  *See* 42 C.F.R. § 422.166(h)(2).  During the first plan preview in August, CMS asks Part C and D plan sponsors to closely review the Star Ratings methodology and their posted numeric data for each measure. The second plan preview in September includes any revisions made as a result of the first plan preview and provides a preview of the preliminary Star Ratings for each measure, domain, summary score, and overall score.  During the second plan preview, CMS asks Part C and D sponsors again to closely review the methodology and their posted data for each measure, as well as their preliminary Star Rating assignments.  This is an informal administrative process in which MAOs send any comments or questions to CMS by email and CMS responds in kind.

CMS regulations also provide for a more formal appeal process after the Star Ratings have been published that allows MAOs to "appeal quality bonus payment status determinations." 42 C.F.R. § 422.260(a).  An MAO must first seek reconsideration "by providing written notice to CMS within 10 business days of the release of its [quality bonus payment] status."  *Id*. § 422.260(c)(1)(i).  The MAO may appeal an adverse decision by the reconsideration official via an informal hearing request.  *Id*. § 422.260(c)(2).  A hearing officer then issues a decision to the MAO.  *Id*. § 422.260(c)(2)(vi).  The hearing officer's decision is then subject to review and modification by the CMS Administrator within 10 business days of issuance.  *Id*. § 422.260(c)(2)(vii).  If the Administrator does not review and issue a decision within 10 business days, the hearing officer's decision is final and binding.  *Id*.

**STANDARD OF REVIEW**

In this action proceeding under the Medicare statute, judicial review is governed by the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and decided on an administrative record. *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 916-17 (D.C. Cir. 2009). Accordingly, "'the district court does not perform its normal role' but instead 'sits as an appellate tribunal'" resolving legal questions.  *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (quoting *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)). Although the parties move for summary judgment, the "standard set forth in Rule 56(c) . . . does not apply."  *Gentiva Healthcare Corp. v. Sebelius*, 857 F. Supp. 2d 1, 6 (D.D.C. 2012), *aff'd*, 723 F.3d 292 (D.C. Cir. 2013).  Rather, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id*.

The APA provides for courts to "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in

10

accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C).  Under the APA's "arbitrary or capricious" standard, the Court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).  An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

The "arbitrary or capricious" standard is "narrow . . . as courts defer to the agency's expertise."  *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfr.'s Ass'n*, 463 U.S. at 43).  The Court "is not to substitute its judgment for that of the agency."  *Id*.  In Medicare cases, the "'tremendous complexity of the Medicare statute" "adds to the deference which is due to the Secretary's decision.'"  *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) (quoting *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994)).  The question is not whether the agency's policy is the "best" or only solution, but whether it is a "reasonable solution."  *Petal Gas Storage, L.L.C., v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007).

Likewise, the Secretary's factual findings can be set aside only if they are "unsupported by substantial evidence" in the administrative record.  5 U.S.C. § 706(2)(A); *see also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–15 (1971).  The substantial evidence standard is satisfied if the final agency decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966) (internal quotation marks and citation omitted); *see also City of South Bend v.*

11

*Surface Transp. Bd.*, 566 F.3d 1166, 1170 (D.C. Cir. 2009). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620 (citations omitted); *SEC v. Fed. Lab. Rels. Auth.*, 568 F.3d 990, 995 (D.C. Cir. 2009).

## ARGUMENT

Plaintiffs' claims in this litigation regarding their 2025 Star Ratings are limited. They do not challenge CMS's authority to implement the Star Ratings system or to use performance on foreign-language calls when doing so. Nor do they challenge the reasonableness of the methodology and protocols CMS has adopted to measure such performance. Rather, they claim only that CMS's determination that one French-language test call was unsuccessful violated the agency's methodology and protocols or applied them inconsistently or without sufficient explanation. Plaintiffs are wrong for the reasons below.

## I.    CMS'S DETERMINATION THAT THE CALL WAS UNSUCCESSFUL WAS FULLY CONSISTENT WITH ITS PUBLISHED PROTOCOL.

Plaintiffs claim that CMS violated its own decision-making criteria when it included the challenged French-language call in their raw score on the call center measure for purposes of their Star Ratings. *See* Pls.' Mem. at 13-15. But the record clearly shows that CMS properly deemed the test call unsuccessful consistent with its published methodology and protocol.

CMS's published guidance explains that test calls begin with the interviewers "plac[ing] the call in a foreign language" to the toll-free number provided by the MAO. AR5-6. "The majority of the time [interviewers] encounter an IVR," or automatic Interactive Voice Response system. *Id.* "In order to replicate a beneficiary's actual experience, CMS telephone interviewers who are testing a language other than the primary language will not make a selection in the IVR

system if the instruction is only in the primary language."  AR39.  "If the IVR instruction is available in the language being tested, the test callers will make an appropriate IVR selection."  *Id*.  "[W]hen the interviewer encounters an IVR, the plan has 10 minutes before the test call will time out if no CSR comes to the phone."  AR16.  "[I]f an interviewer sat on the line waiting for the plan CSR for 10 minutes in the IVR or on hold but no CSR picked up the call, the call will time out and it will be counted as an unsuccessful call."  AR16-17.

The protocol also provides that "if we establish contact with your CSR while speaking in a foreign language, the call is connected."  AR17.  The Technical Notes make clear, however, that a call is connected only "when the caller confirms that the call connects to the CSR."  AR11.  A call "will be scored as unsuccessful if we are not able to reach a live CSR."  AR6.  If the interviewer does reach a live customer service representative, CMS "permit[s] eight minutes for the CSR to connect to an interpreter and answer our introductory question."  *Id*.  "In order for the interpreter availability/LEP measure to be complete, there must be true communication, meaning the CSR must answer the introductory question and be able to converse in the foreign language we are testing with or without an interpreter's assistance."  *Id*.  A test call is considered unsuccessful if the call center disconnects or hangs up the call before it is completed, if the call center experiences phone line problems or technological barriers that prevent the call from completing, if the interviewer spends more than 10 minutes navigating the IVR or on hold, or if the customer service representative cannot assist the interviewer with their questions or cannot forward the interviewer to someone who can assist.  AR5, AR8-9, AR18.

Here, there is no dispute that the interviewer dialed the correct telephone number for Plaintiffs' call center; that when prompted by the call center's automated Interactive Voice Response system, the interviewer correctly selected menu option "6" to continue in French; that

the interviewer then heard a brief sound—perhaps a fragment of a word—and then silence; that the interviewer tried to engage a live customer service representative by saying "hello" or "allô" but heard no response; that after nearly 8 minutes more of silence, the call center disconnected the call; and that at no point during the call did a customer service representative ever audibly identify themselves or otherwise make their presence known to the interviewer.

All of this is evident simply by listening to Plaintiffs' own recording of the call—which is available for the Court to hear for itself. *See* Native File for AR138. It is also consistent with the interviewer's contemporaneous call notes, which provided: "[I] was able to press option 6 for French. [There was] silence during hold queue. [A] voice cut in for a second then hold went silent. [A]fter about 500 seconds 'the called person hung up' [and] line disconnected. Silence during hold queue[.] Call timed out before I could get an answer to my question. . . ." AR66; *see also* Native File for AR182.

Plaintiffs originally sought to invalidate the test call claiming that "there were audio issues on the caller's side." AR54. But they abandoned that argument once their own recording showed that the interviewer could be heard clearly on the call center's system, while the customer service representative could not. Plaintiffs now argue that the call should be invalidated because the interviewer never asked the introductory question. Pls.' Mem. at 13-14. This argument, however, ignores CMS's protocol—and basic common sense—that the interviewer should not ask the introductory question until *after* they have confirmed that they have established contact with a live customer service representative: "[I]f we establish contact with your CSR while speaking in a foreign language, the call is connected. *Then* we ask an introductory question (for example, "Are you the right person to answer questions about [Plan name's] health benefits?'" AR17 (emphasis added). Plaintiffs' position appears to be that the interviewer was required to ask the introductory

14

question even though he reasonably believed he was still on hold, having received no response to his "hello" or "allô" greeting.  But the study attempts to "replicate a beneficiary's actual experience."  AR39.  It would be unreasonable to expect a beneficiary to start asking questions without first confirming that they were speaking to a live person.  Moreover, if an interviewer actually did so, MAOs would surely complain that this unfairly starts the 8-minute clock in which they have to contact an interpreter and complete the call.

Plaintiffs also claim the interviewer violated CMS protocol by saying "hello" in English instead of French.  *See* Pls.' Mem. at 14 n.13.  But it is not clear from the recording whether he said "hello" or the nearly identical sounding French word "allô" used as a greeting by French speakers when talking on the phone.  *See, e.g.*, Collins French-English Dictionary, available at www.collinsdictionary.com/dictionary/french-english/allô.    Even  if  the  interviewer  did  say "hello," CMS has explained in the Technical Notes that "when testing interpreter availability, our interviewers are simulating the experience of a non-English-speaking caller." AR28.  It would not be unusual for a French-speaking Medicare beneficiary living in the United States to say "hello" even when requesting service in French.  Moreover, there is no suggestion that saying "hello" confused the customer service representative or prevented the call from being processed— especially given that the interviewer had already correctly selected "6" for French in the call center's interactive voice response system.

In any event, this argument was waived because Plaintiffs did not raise it at the administrative level.  *See Louisiana Env't Action Network v. EPA*, 382 F.3d 575, 584 (5th Cir. 2004) ("Absent exceptional circumstances, a party cannot judicially challenge agency action on grounds  not  presented  to  the  agency  at  the  appropriate  time  during  the  administrative proceeding."); *see also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (the

"general rule," rooted in "[s]imple fairness," is that "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."); *Cal. Communities Against Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir. 2019) ("The waiver rule exists to 'ensure an agency has had an opportunity to consider the matter, make its ruling, and state the reasons for its action.'").

Finally, Plaintiffs argue that the interviewer did not follow proper procedures that purportedly apply if it appears that the customer service representative cannot hear them. *See* Pls.' Mem. at 14 n.14.[1]  But the audio recording makes clear that the opposite happened:  the interviewer could not hear a customer service representative.  Indeed, given that the interviewer received no response when he said "hello" or "allô," he reasonably believed that he was still on hold.  Under such circumstances, the interviewer is not required under the protocol to assume that a customer service representative is there silently on the call.

## II.    CMS DID NOT TREAT PLAINTIFFS DIFFERENTLY THAN OTHER SIMILARLY SITUATED PLANS.

Plaintiffs assert that CMS's action was arbitrary and capricious because the agency purportedly treated their foreign-language test call differently than a test call to the call center of a different health plan, Elevance Health Inc. *See* Pls.' Mem. at 15-18.  Plaintiffs claim that they and Elevance "are similarly situated, yet faced diametrically opposed CMS decisions." *Id*. at 17. But the two calls differ in at least one critical respect—i.e., the evidence here clearly shows that Plaintiffs' call center was to blame for the unsuccessful call.

---

[1]  Plaintiffs claim that these "proper procedures" appear in an interviewer training manual that is not part of the administrative record.  *See* Pls.' Mem. at 14 n.13 & n.14.  As explained in Defendants' opposition to Plaintiffs' motion to supplement the administrative record, Plaintiffs have failed to meet the standard for supplemental.  *See* ECF No. 16.

Plaintiffs identify four purported similarities between the two calls—three of which are superficial.  For example, they claim that both calls involved the same performance measure, applied to a single call, where a single failure caused a lower Star Rating.  *See* Pls.' Mem. at 17.  But this is true nearly every time an MAO challenges the call center measure.  Plaintiffs cannot possibly argue that CMS must invalidate a call any time it exhibits these features regardless of the reason for the failure or the egregiousness of the call center's conduct.  If that were so, the measure would lose all value.

Plaintiffs also argue that the two calls are similar in that "there is no evidence that the issue that CMS identified as problematic can be attributed to the plan's call center." Pls.' Mem. at 17.  But this is simply not true.  As Plaintiffs' own audio recording of the call proves, this is not a case where unknown technical issues prevented each side from hearing the other.  The interviewer could be heard clearly on the call center's system; the customer service representative could not be heard by either the call center's system or the interviewer.  Whether this was because there was never a customer service representative on the line, or because the customer service representative experienced audio difficulties or simply chose not to speak, is irrelevant.  It is clear from the recording that the interviewer was unable to confirm that he had connected to the customer service representative—as is required by the study protocol.  Accordingly, it is clear that the call center— not the interviewer—was to blame for the failed test call.

Tellingly, Plaintiffs urge this Court not to look too closely at the Elevance call.  *See id.* at 17 ("CMS cannot legitimately dive into the detailed minutiae that way").  Contrary to Plaintiffs' suggestion, CMS did not simply "enumerat[e] [] factual differences between cases."  *Id.* at 18 (citing *Prairie Band Potawatomi Nation v. Yellen*, 63 F.4th 42, 47 (D.C. Cir. 2023)).  Rather, the agency explained the critical fact that made this call different: "At no point during your provided

record can your plan be heard trying to engage the French speaking caller."  AR223.  Thus, CMS

was not required to invalidate the challenged call just because it did so with the Elevance call.

### III.    CMS PROVIDED PLAINTIFFS WITH AN EXPLANATION OF ITS DECISION ON MULTIPLE OCCASIONS DESPITE PLAINTIFFS' SHIFTING THEORIES.

Plaintiffs also claim that CMS did not sufficiently explain its decision or respond to their

"major objections."  Pls.' Mem. at 18-21.  "Arbitrary and capricious review focuses on whether an

agency articulated a rational connection between the facts found and the decision made, and '[i]t

is well-established that an agency's action must be upheld if at all, on the basis articulated by the

agency itself.'"  *Pension Ben. Guar. Corp. v. Wilson N. Jones Mem. Hosp.*, 374 F.3d 362, 366-67

(5th Cir. 2004) (quoting *Motor Vehicle Mfr.'s Ass'n*, 463 U.S. at 42–43).  "The Supreme Court has

made clear that when an agency's explanation does not permit a court to evaluate the agency's

action, 'the proper course, except in rare circumstances, is to remand to the agency for additional

investigation or explanation."  *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1353 (D.C. Cir. 2014)

(quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).  "But none of that means

the [agency] must follow a particular formula or incant 'magic words' . . . ."  *Garland v. Ming

Dai*, 593 U.S. 357, 369 (2021).  "To the contrary, a reviewing court must 'uphold' even 'a decision

of less than ideal clarity if the agency's path may reasonably be discerned.'"  *Id.* (quoting *Bowman

Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  "The administrative

record . . . need only 'indicate the determinative reason for the final action taken. . . .'"  *Wilson N.

Jones Mem. Hosp.*, 374 F.3d at 367 (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973)).

Here, as Plaintiffs acknowledge, the plan review process is "an informal one."  Pls.' Mem.

at 11.  The record shows that several times during that process, CMS clearly explained its reasons

for rejecting Plaintiffs' requests to invalidate the challenged call—even as their theories shifted

over time.  For example, in a July 19, 2024 email, Plaintiffs claimed that "this call should be

invalidated due to audio issues on the caller's side" because "[o]ur agent reported speaking in French to assist the caller, hearing a 'hello' from the caller side, then a lack of audio from the caller side, indicating an audio issue due to the caller's equipment, connection, carrier, or something else." AR54. Plaintiffs argued that the call was similar to one of their calls from 2022 that "CMS invalidated" because "evidence and data indicated a potential issue on the survey caller's side." *Id*. Plaintiffs attached an email from CMS explaining its decision to invalidate the 2022 call: "The attached raw data and call log show that this call ended as a far side disconnect. . . . However, the plan's call log shows that their agent did not disconnect. Due to this discrepancy between the two call logs, this call has been invalidated." AR58. Plaintiffs admitted "the details of this call are different" but claimed "they are similar in that for this call there is also sufficient evidence to show an error or technical issue occurred on the caller's side." AR54.

CMS responded on July 25, 2024, denying the request and explaining as follows:

> The interviewer was able to connect with the plan and inform the plan they needed a French interpreter. The interviewer was on hold and then connected with a CSR but only heard the sound of a voice for a second. The interviewer said, "Hello," but there was no response from the CSR. The interviewer continued to hold until the CSR disconnected, confirmed by the attached raw data and call log. . . . We have no indication of audio issues with this call, or others placed by this interviewer.

AR75. CMS also explained that "[t]he previous case you reference was invalidated due to conflicting disconnect directions, that is not what occurred here." *Id*.

On July 31, 2024, Plaintiffs asked CMS to reconsider. AR85-93. They conceded that "[w]e are not disputing the experiences reported by the survey caller[]," but claimed that "there were similar audio issues noted on *both sides*," and that "[w]ithout definitive evidence of the error being [the call center's], the calls should be invalidated from the study." AR85 (emphasis added). Plaintiffs also conceded that unlike the challenged call, the 2022 invalidated call concerned a "disconnection," but argued that it set a "precedent" for "how to handle situations when evidence

19

fails to conclusively determine whether the failure was due to an error by the plan or by the tester." *Id*.  As another example of this precedent, they cited Elevance's successful administrative appeal of a disconnected TTY call, claiming it "reiterates and clarifies that a call will not be held against a plan unless there is evidence that the call failed due to actions of the plan."  *Id*.  Based on these two examples, Plaintiffs argued that the challenged call should be invalidated because "there is no evidence indicating error on our end and not the testers."  *Id*.

On August 13, 2024, CMS responded informing Plaintiffs that the outcome of the challenged call "will remain as is."  AR94.  CMS explained that "we understand that you believe there were audio issues on the CMS side.  However, as we previously stated, [w]e have no indication of audio issues with this call, or others placed by this interviewer."  *Id*.  On August 14, 2024, Plaintiffs again emailed CMS reiterating that "[w]e have no evidence the audio issues occurred on our end and have provided evidence that systems were working and the agents were ready and able to fulfill the testing requirements."  AR104.  They argued that "without evidence of a failure on our end these calls should be invalidated similar to the outcome in the Elevance appeal."  *Id*.  CMS responded that "CMS has provided you evidence to support our conclusions in our previous responses, and we will not be altering our decision at this time."  AR114.

On September 13, 2024, Plaintiffs wrote CMS yet again, arguing that "[w]ithout specific evidence that the audio issues with these calls occurred on our end, rather than the tester's end, including them as attempted contacts would be improper, and to do so would have a material impact to multiple contracts' Star Ratings."  AR125.  For the first time, Plaintiffs attached an audio recording of the call and asserted that "audio from the tester[] cannot be heard . . . , indicating a potential issue on the tester's end."  *Id*.  On September 16, 2024, CMS responded that the outcome would "remain as is" because "[t]he plan's provided recording confirms the interviewer's

experience, that they connected to a CSR and heard someone say something and then cut out.  The attached raw data and call log confirms that the plan disconnected the call. . . ."  AR168.

On September 19, 2024, Plaintiffs emailed CMS asserting—for the very first time—the argument they advance in this litigation:

> According to the technical specifications, "completed contact with an interpreter is defined as establishing contact with an interpreter and confirming that the customer service representative can answer questions about the plan's . . . benefit within eight minutes" (emphasis added).  For this call, there is no evidence indicating the interviewer asked a question during the eight minutes or that the reason the question was not received was related to UHC's system as opposed to the interviewer's system.  In any event, the CSR never had an opportunity to provide the appropriate response, and, therefore, this call should be invalidated and removed from the survey.

AR183.  Plaintiffs argued that while "[t]he call log suggests the interviewer believed the call was unsuccessful because the call was disconnected while on hold," "the call was not dropped while on hold and the CSR appropriately ended the call after eight minutes after not receiving the introductory question."  AR184.  They repeated the argument that "invalidating this call ensures that we are not held to a different standard than Elevance, whose call decision was overturned earlier this year because there was no evidence that the call failed due to actions or inactions by Elevance."  *Id.*

On September 24, 2024, CMS again rejected Plaintiffs' request, explaining that "[t]he plan's provided recording confirms the interviewer's experience, that they connected to a CSR and heard someone say something and then cut out.  The recording shows the brief noise that the interviewer referenced at the 9 second mark.  *At no point during your provided recording can your plan be heard trying to engage the French speaking caller*.  The attached raw data and call log confirms that the plan disconnected the call. . . ."  AR223 (emphasis added).

This record demonstrates clearly that CMS sufficiently considered Plaintiffs' arguments even as they were evolving and provided a reasoned explanation for why it determined that the

challenged call should not be invalidated.  Ignoring this lengthy back-and-forth, Plaintiffs argue that CMS failed to address some of their "major objections" to the agency's decision.  *See* Pls.' Mem. at 18.  They are wrong.

Plaintiffs' first "major objection" is the claim that the interviewer should have asked the introductory question after connecting with the call center's customer service representative.  *See* Pls.' Mem. at 19.  Plaintiffs did not raise this issue originally and did so only after the audio recording demonstrated that the audio issues occurred on the call center's side.  CMS nevertheless sufficiently responded to this argument once it was raised, noting that "[a]t no point during your provided recording can your plan be heard trying to engage the French speaking caller." AR223.

Plaintiffs' second "major objection" is the claim, Pls.' Mem. at 20-21, that CMS treated the challenged call differently than the Elevance call, which was invalidated under the principle that "a call will not be held against a plan unless there is evidence that the call failed due to actions of the plan."  AR85.  During the plan preview process, Plaintiffs first cited one of their own invalidated calls from 2022 for this principle.  AR54.  CMS distinguished this call, noting that "[w]e have no indication of audio issues with this call, or others placed by this interviewer," and that "[t]he previous case you reference was invalidated due to conflicting disconnect directions, that is not what occurred here."  AR75.  Only later did Plaintiffs cite the Elevance decision for the same principle.  But having already distinguished this precedent, CMS was not required to do so again when Plaintiffs later cited the Elevance call as another example of the same precedent. *LeMoyne-Owen College v. N.L.R.B.*, 357 F.3d 55, 60 (D.C. Cir. 2004) ("An agency is by no means required to distinguish every precedent cited to it by an aggrieved party.").

Plaintiffs also claim that CMS ignored their argument that the disconnection of the call was irrelevant.  *See* Pls.' Mem. at 21.  But this erroneously assumes that CMS based its decision on the

fact that Plaintiffs' call center disconnected the call after 8 minutes of silence.  What CMS actually said was "[t]he plan's provided recording confirms the interviewer's experience, that they connected to a CSR and heard someone say something then cut out."  AR 226.  CMS went on to explain that "[t]he attached raw data and call log confirms that the plan disconnected the call."  *Id.*  In context, this statement offers further support to the prior sentence, that is, that the call log data, the audio recording, and the interviewer's experience all paint the same picture of an interviewer who attempted to reach the call center, stayed on the line for 8 minutes of silence, and was ultimately disconnected by the call center.  CMS nowhere stated that the *reason* for including the call in the study was the call center's disconnection of the call.

CMS was not obligated to respond to Plaintiffs' rebuttal of an argument CMS did not make.  Even Plaintiffs at the time recognized that CMS had not claimed that the disconnection by the plan was the source of the problem.  That CMS did not specifically explain that it was not, in fact, relying on the disconnection by the plan does not render the decision here arbitrary and capricious.  Again, it was not required to "distinguish every precedent" from an "aggrieved party," *LeMoyne-Owen*, 357 F.3d at 60, and the reasons for its decision are far from unclear.

## IV.    CMS DID NOT IMPROPERLY SUBDELEGATE ITS DECISION HERE

 "When Congress confers regulatory authority on an agency, subdelegation of that authority 'to outside parties [is] assumed to be improper absent an affirmative showing of congressional authorization.'"  *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1215 (D.C. Cir. 2024) (quoting *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004)).  "Not all third-party involvement in the regulatory process is such a delegation, however."  *Int'l Dark-Sky Ass'n*, 106 F.4th at 1215-1216.  "We have recognized 'three specific types of legitimate outside party input into agency decision-making processes: (1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving."  *Id*. at 1216 (quoting *U.S. Telecom*,

359 F.3d at 566).  "[A] federal agency may use an outside entity, such as a state agency or a private contractor, to provide the agency with factual information."  *U.S. Telecom*, 359 F.3d at 567.  And "a federal agency may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decisions itself."  *U.S. Telecom*, 359 F.3d at 568.

Here, the administrative record shows that the outside entity Hendall was providing recommendations.  When it reviewed test calls at CMS's request, it concluded each review with a recommendation, e.g., "recommend invalidating."  *E.g.,* AR 67.  Similarly, it is clear that CMS made the final decisions.  *E.g.*, *id.* at 66 ("I agree with invalidating the single call.  Please provide the new result.").  Moreover, the record shows pushback and request for clarification from CMS: "I am confused as to why the second call would suggest invalidation when it appears that the recording matches what was reported."  *Id.* at 153.  This record indicates that Hendall's role was "fact gathering" and "advice giving," and the agency made the final decisions itself.

There is no basis to conclude that Hendall had a stake in the project it was evaluating. Plaintiffs offer no evidence—because there is none—that Hendall or its subcontractor would suffer any negative consequences from invalidated calls.  In the case Plaintiffs cite on conflicts of interest, the outside consulting firm that prepared an environmental impact statement had also been hired to design the project that was the subject of the environmental impact statement—meaning the outside consultant had a direct financial interest in an environmental impact statement that would have permitted the project to go through.  *See Sierra Club v. Sigler*, 695 F.2d 957, 962 n.3 (5th Cir. 1983).  That is not the case here.  Accordingly, CMS did not improperly subdelegate its decision-making authority with respect to the challenged French-language call.

## CONCLUSION

For the reasons stated, Defendants respectfully request that the Court grant summary judgment in the Defendants' favor and deny Plaintiffs' summary judgment motion.

Respectfully submitted,

DAMIEN M. DIGGS
UNITED STATES ATTORNEY

*/s/ James G. Gillingham*
JAMES G. GILLINGHAM
Texas State Bar No. 24065295
james.gillingham@usdoj.gov
110 N. College, Suite 700
Tyler, TX 75702
(903) 590-1400
Fax: (903) 590-1436

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2024, a true and correct copy of the foregoing document was filed electronically with the court and has been sent to all known counsel of record via the Court's electronic filing system.

*/s/ James G. Gillingham*
JAMES G. GILLINGHAM
Assistant United States Attorney