# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISON

| | |
|---|---|
| UNITEDHEALTHCARE BENEFITS OF TEXAS, INC., et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>CENTERS FOR MEDICARE & MEDICAID SERVICES, et al.,<br><br>*Defendants.* | Civil Action No. 6:24-cv-00357-JDK |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiffs' reply brief confirms that the circumstances of the challenged foreign-language call are not in dispute. The test interviewer dialed the number for Plaintiffs' call center. When prompted by the call center's automated Interactive Voice Response ("IVR") system, the interviewer selected menu option "6" to continue in French. The interviewer then heard a brief sound—perhaps a fragment of a word—and then silence. The interviewer tried to engage a live customer service representative by saying "hello" or "allô" but heard no response. Because of this, the interviewer believed he was still on hold. After roughly 8 minutes of silence, the call center disconnected the call. At no point during the call did a customer service representative ever engage the interviewer or make their presence known. Because the interviewer can be heard on the call center's own audio recording, there were no audio or technical issues with the interviewer's system. In contrast, the customer service representative could not be heard either by the interviewer or the call center.

The Centers for Medicare & Medicaid Services ("CMS") concluded that this did not meet the agency's criteria for a "completed" call. Plaintiffs do not dispute this, but insist that CMS should have "invalidated" the call and that its failure to do so was contrary to the agency's guidelines, inconsistent with how the agency had treated other parties, insufficiently explained, and an improper delegation to a private contractor. Defendants' cross-motion showed why each argument fails, and as discussed below, Plaintiffs' reply does not overcome those flaws.

I.  **CMS'S DETERMINATION THAT THE CALL WAS UNSUCCESSFUL WAS FULLY CONSISTENT WITH ITS PUBLISHED PROTOCOL.**

As Defendants showed in their opening brief, CMS's determination that the challenged call was unsuccessful was consistent with the agency's published guidelines. *See* Defs.' Cross-Mot. at 12-14. Those guidelines explain that for a test call to be considered "completed," the interviewer must "connect with a live" customer service representative, who "must answer the introductory

1

question and be able to converse in the foreign language we are testing with or without an interpreter's assistance" within the given time parameters. AR6. Clearly, the challenged call did not meet these criteria. Thus, consistent with CMS's guidelines, when calculating the percentage of completed foreign-language availability calls for the call center, CMS included the call as an attempted call in the denominator but not as a completed call in the numerator. AR10.

In this litigation, Plaintiffs claim that CMS's guidelines require that the challenged call be invalidated. Their reply focuses entirely on their theory that once a call is connected for any length of time, the call must be invalidated if the interviewer fails to ask a standard introductory question—no matter what else happens. According to them, the only issue here is whether the call connected, and CMS has conceded that it did. The problem with this argument is that no such rule exists in CMS's guidelines. Because the undisputed facts show that the interviewer connected with a customer service representative for only a split second and, receiving no response when he said "hello" or "allô," believed he was on hold until the call center disconnected the call, CMS properly deemed this as an attempted but not completed call consistent with its guidelines.

**A.  There Is No Rule that If a Call is "Connected" for Any Length of Time, the Interviewer Must Ask the Standard Introductory Question.**

There is simply no rule that if an interviewer has "connected" for any length of time with a customer service representative—regardless of what happens next—CMS must invalidate the call if the interviewer does not ask the introductory question. Plaintiffs cite nothing in CMS's guidance saying as much. Indeed, for a case involving a claim that CMS violated its own guidelines, Plaintiffs spend shockingly little time actually addressing those guidelines. The guidelines discuss invalidating a test call in only two circumstances: when a TTY operator dials the wrong number (AR19) and when the call is made outside of the 8 a.m. to 8 p.m. window in which call centers are required to be open (AR29). Neither circumstance is relevant here.

Moreover, many of the examples the guidelines provide of unsuccessful calls are problems that might arise even after an interviewer has connected with a customer service representative but before they can ask the introductory question. For example, the guidelines note that "[a] call is classified as unsuccessful" if the "[s]urvey could not continue" because either the "Call Center disconnected call (including hanging up)," there were "phone lines problems" or a "technology barrier," or the "CSR tells our interviewer to call back." AR8-9. If Plaintiffs were correct (they are not), CMS would have to invalidate a call even if (a) the call center disconnects the call immediately after the interviewer has connected with a customer service representative but before they can get out the introductory question, (b) phone line problems or technical barriers at the call center prevent the interviewer from communicating with a customer service representative after they connect, or (c) the customer service representative told the interviewer to call back before the interviewer can ask the question. The guidelines make clear that that is not the rule.

Plaintiffs' position that the interviewer must ask the introductory question if a call connects for any length of time not only finds no support in CMS's published guidelines, but is also inconsistent with the purpose and design of the foreign-language availability measure. The survey attempts to "replicate a beneficiary's actual experience" (AR39), and a Medicare enrollee would not be expected to start asking questions if they believed—as the interviewer here did—that they had been put on hold. The wording of the standard introductory question itself assumes a live person is still on the line: "Are you the right person to answer questions about [Plan name's] health benefits?" AR6. And the design of the survey is to measure whether a *live* customer service representative can actually *communicate* with the interviewer in a foreign language. AR6 ("In order for the interpreter availability/LEP measure to be complete, there must be true communication, meaning the CSR must answer the introductory question and be able to converse

3

in the foreign language we are testing with or without an interpreter's assistance."); *see also* AR5 ("we determine if we can reach a live CSR at the plan who can assist us with our questions"); AR34 ("Interpreter availability is defined as the ability of a caller to communicate with someone and receive answers to questions in the caller's language.").

In sum, Plaintiffs fabricate out of whole cloth a rule that once an interviewer has connected for any length of time with a customer service representative, they must ask the introductory question, no matter what happens. Such a rule finds no support in the guidelines and is absurd. It would require an interviewer to ask the question even when doing so is patently futile—for example, if the call center has already disconnected the call, or if the customer service representative experiences technical issues preventing them from communicating or places the interviewer on hold as soon as the call connected. The last two are particularly relevant here because the interviewer believed that after connecting with a customer service representative for a split second, he was placed on hold for the rest of the call, and the lack of audio from the customer service representative suggests a technical issue on the call center's side. Adopting Plaintiffs' rule would also mislead Medicare beneficiaries about the quality of a health plan's call center operations because the average beneficiary would not likely consider this type of call a success.

### B. The Interviewer Reasonably Believed He Was Connected for Only a Split Second Before Being Placed on Hold.

Plaintiffs place great weight on three statements where CMS noted that the interviewer had briefly "connected" with the customer service representative, which Plaintiffs characterize as "concessions" that "end the case." Pls.' Reply at 2. Not only are those statements not concessions, they highlight key features of the call justifying CMS's decision. Each of those statements makes clear that the interviewer believed that the connection lasted for only a split second before he was placed back on hold for the rest of the call. For example, in its July 25, 2024 email, CMS stated:

4

"The interviewer was on hold and then connected with a CSR but only heard the sound of a voice *for a second*. The interviewer said, 'Hello,' but there was no response from the CSR. The interviewer *continued on hold* until the CSR disconnected." AR86 (emphases added). Likewise, in its September 16, 2024 email, CMS noted that "[t]he plan's recording confirms the interviewer's experience, that they connected to a CSR and *heard someone say something and then cut out*." AR199 (emphasis added). And in its September 24, 2024 email, CMS explained that "[t]he plan's provided recording confirms the interviewer's experience, that they connected to a CSR and *heard someone say something and then cut out*. The recording shows *the brief noise* that the interviewer referenced at the 9 second mark. At no point during your provided recording can your plan be heard trying to engage the French speaking caller." AR 223 (emphases added).

      These statements mirror the interviewer's call log. During each test call, interviewers code what occurs in real time. This process creates a detailed call log that provides time stamps for when a call begins and ends and shows how long each stage of the call took. The Technical Notes explain that "when testing interpreter availability, there are separate timers for many functions. There is one for time spent in the IVR and a separate timer for the hold queue, and there is still another timer for time waiting for the interpreter to join." AR13. The Technical Notes define when each of these timers begins and ends. The "Hold Time" timer measures "the time spent on hold by the interviewer following the interactive voice response (IVR) system, touch-tone response system, or recorded greeting, and *before reaching a live person*." AR11 (emphasis added). The Technical Notes state that "[i]f a live CSR does come to the phone before those 10 minutes expire, our interviewer then selects 'Live Operator' on their screen so that the raw data will capture the time when this occurred." AR13. This selection starts the timer for "LEP Hold Time," which

5

captures "the time waiting for the interpreter" and "begins *after reaching a live customer service representative*." AR12 (emphasis added).

The call log for the challenged call confirms that after navigating through the call center's IVR system, the interviewer believed he connected with someone for only a split second before being placed on hold for the rest of the call. The log shows that the interviewer dialed the number for the call center at 2:11 p.m. and 53 seconds on February 19, 2024, *see* Row 2, Col. L of Native File for AR82; an IVR system answered 12 seconds later at 2:12 p.m. and 5 seconds, *see id.*, Row 2, Col. AL; the interviewer took 43 seconds to navigate the IVR system, *see id.*, Row 2, Cols. AP and AX; and the interviewer coded the remaining 512 seconds of the call as "Hold Time," *see id.*, Row 2, Col. AY. Because the interviewer never coded "Live Operator," the "LEP Hold Time" interval never began.[1] *See id.*, Row 2, Cols. AR and AZ. After the call, the interviewer selected the ERC code 293.4, which is the code for "Plan Call Center Dropped Call – Other," *id.*, Row 2, Cols. G and H, and added the "finish note": "[I] was able to press option 6 for French. [S]ilence during hold queue. [A] voice cut in for a second then hold went silent. [A]fter about 500 seconds 'the called person hung up' line disconnected. Silence during hold queue[.] Call timed out before I could get an answer to my question. . . ." *Id.*, Row 2, Col. U.

The audio recording confirms the interviewer's experience. *See* Native File AR138. On it, a brief sound—perhaps a fragment of a word—can be heard for a split second and then silence.

---

[1] Plaintiffs claim that the training manual requires interviewers to ask the introductory question as soon as they connect with the customer service representative. *See* Pls.' Reply at 8 n.5. But the manual actually states that "[o]nce you reach a live CSR *and advance to the LIVE screen*, you ask the question verbatim, meaning you read the question exactly as it is written to the CSR." Ex. A to Pls.' Mot. to Suppl. at 19 (ECF. No. 13) (emphasis added). Here, the interviewer never advanced to the LIVE screen because the connection lasted for only a split second. In any event, the training manual—like CMS's guidance—contemplates cases like this where "[t]he line suddenly drops while the CSR is speaking or attempting to transfer the call" or "the CSR puts you on hold" before the interviewer can ask the question. *See id.* at 36. Thus, the manual adds nothing new.

The interviewer can then be heard saying "hello" or "allô," but receives no response. The rest of the call is silent. At no point can anyone from the call center be clearly heard.

Plaintiffs argue that the interviewer was still required to ask the introductory question because—unbeknownst to him—he "was not *actually* on hold." Pls.' Reply at 4 (emphasis in original). But the call log shows that the interviewer actually believed he was on hold, and Plaintiffs do not argue that this belief was unwarranted. Nor do they cite anything in the guidelines requiring an interviewer who believes they are on hold to ask the introductory question.

### C.     Defendants' Position Has Remained Consistent Throughout This Dispute.

Plaintiffs attempt to manufacture a claim that Defendants are engaging in a *post hoc* rationalization by mischaracterizing their position as arguing that the challenged call "never connected." Pls.' Reply at 3. But that is not Defendants' position. Defendants stated repeatedly in their opening brief that after navigating the IVR system, the interviewer "heard a brief sound—perhaps a fragment of a word—for a split second and then silence," and that he "responded 'hello' or 'allô,' but hearing nothing in response, continued to wait on the line believing he was on hold." Defs.' Cross-Mot. at 2; *see also id*. at 14-15.

This position is identical to CMS's three purported "concession" statements made during the informal administrative review process. Indeed, Defendants quoted those three statements in full in their opening brief. For example, CMS's July 25, 2024 email stated: "The interviewer was on hold and then connected with a CSR but only heard the sound of a voice for a second. The interviewer said, 'Hello,' but there was no response from the CSR. The interviewer continued to hold until the CSR disconnected." AR75; *see also* AR223 ("The plan's provided recording confirms the interviewer's experience, that they connected to a CSR and heard someone say something and then cut out. The recording shows the brief noise that the interviewer referenced

7

at the 9 second mark. At no point during your provided recording can your plan be heard trying to engage the French speaking caller.").

The only thing that has changed is Plaintiffs' theory. Plaintiffs originally claimed that "[o]ur agent reported speaking in French to assist the caller, hearing a 'hello' from the caller side, then a lack of audio from the caller side, indicating an audio issue due to the caller's equipment, connection, carrier, or something else," and that "the caller's audio issues prevent[ed] our CSR from communicating with the caller." AR54. Plaintiffs then claimed in a later submission that there were "audio issues noted *on both sides*." AR85 (emphasis added). When the call center's audio recording revealed that the interviewer could not hear the customer service representative, Plaintiffs shifted again, arguing that "there is no evidence indicating the interviewer asked a question during the eight minutes or that the reason the question was not received was related to [the call center's] system as opposed to the interviewer's system." AR183. In their reply, Plaintiffs' position has evolved yet again, claiming it does not matter if the call center was at fault for the interviewer not being able to ask the question. *See* Pls.' Reply at 6 ("the question whether the test caller was at fault for his decision not to ask the introductory question is irrelevant.").

## II. CMS DID NOT TREAT PLAINTIFFS DIFFERENTLY THAN OTHER SIMILARLY SITUATED PLANS.

Defendants showed in their opening brief that the challenged call differed from the call invalidated in the Elevance administrative appeal in at least one critical respect: unlike in Elevance, there is sufficient evidence that Plaintiffs' call center was to blame for the unsuccessful call. *See* Defs.' Cross-Mot. at 16. Plaintiffs' reply mostly restates their claim that CMS's guidelines require that the call be invalidated because the call "connected" and the interviewer did not ask the introductory question. *See* Pls.' Reply at 7. If the Court agrees with Defendants that no such rule exists, Plaintiffs have no independent disparate treatment argument.

8

### III. CMS PROVIDED PLAINTIFFS WITH AN EXPLANATION OF ITS DECISION.

In their opening brief, Defendants showed how CMS reasonably explained its reasons for rejecting Plaintiffs' requests to invalidate the challenged call—even as Plaintiffs' theories shifted over time. *See* Defs.' Cross-Mot. at 18-21. Defendants also noted that even if the Court were to find CMS's explanation insufficient, the proper remedy is to remand to the agency for further explanation. The only thing new in Plaintiffs' reply is their claim, in two separate footnotes, that "no remand on this issue is appropriate, because a remand would unfairly delay resolution of the parties' dispute and serve no useful purpose." Pls.' Reply at 8 n.5. But it is clear that "when an agency's explanation does not permit a court to evaluate the agency's action, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1353 (D.C. Cir. 2014) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). Plaintiffs make no attempt to argue that this is one of the "rare circumstances" warranting a deviation from the normal course.

### IV. CMS DID NOT IMPROPERLY SUBDELEGATE ITS DECISION HERE.

Defendants showed in their opening brief that there was no improper delegation because the third-party contractor that conducted the foreign-language availability study merely provided the agency with background information and recommendations for how to treat certain calls, and the evidence showed that, when necessary, CMS would seek clarification or push back on those recommendations. *See* Defs.' Cross-Mot. at 24. In their reply, Plaintiffs do not respond to Defendants' showing that the contractor merely provided recommendations squarely within the "legitimate outside party input" of "advice-giving." *See Int'l Dark-Sky Ass'n*, 106 F.4th 1206, 1215-16 (D.C. Cir. 2024). Instead, they urge the Court to ignore this evidence because CMS did not happen to disagree with the contractor regarding *this particular call*. Unsurprisingly, Plaintiffs cite no authority for the proposition that if an agency simply agrees with a contractor's

9

recommendation—even if the record shows that the recommendation was correct and the agency was not beholden to its contractor's advice generally—the agency has improperly delegated. Under Plaintiffs' view, an agency could never seek advice from a contractor unless it was committed in advance to do the opposite of that advice.

Plaintiffs also continue to insist that the contractor had a conflict of interest, though they leave the nature of that conflict to the Court's imagination.  They do not dispute Defendants' claim that the contractor had no financial conflict of interest and that the one case Plaintiffs cited for this proposition is inapposite.  *See* Defs.' Cross-Mot. at 24.  They nonetheless assert that the contractor had a "vested interest" in the outcome, Pls.' Reply at 8, never specifying the nature of that interest or the consequences for the contractor if it offered a contrary recommendation.

Perhaps recognizing the lack of support in caselaw and the record for their claims, Plaintiffs resort to overheated rhetoric, warning of "extraordinary consequences" and accusing CMS of an "overly bureaucratic attempt to justify its wrong decision and strange refusal to correct its mistake." Pls.' Reply at 9.  But this is a straight-forward case.  After navigating the call center's automated IVR system, the interviewer heard someone for a split second and then silence.  The interviewer tried to engage a live customer service representative but heard no response.  Because of this, he believed he was still on hold.  After roughly 8 minutes of silence, the call center disconnected the call.  At no point during the call did a customer service representative ever engage the interviewer or make their presence known.  Under these circumstances, the call did not meet the criteria for being a completed call and Plaintiffs point to nothing in CMS's guidance requiring the agency to invalidate the call.  Thus, under that guidance, the call is considered an attempted but not completed call for purposes of Plaintiffs' Star Ratings.

Respectfully submitted,

DAMIEN M. DIGGS
UNITED STATES ATTORNEY

*/s/ James G. Gillingham*
JAMES G. GILLINGHAM
Texas State Bar No. 24065295
james.gillingham@usdoj.gov
110 N. College, Suite 700
Tyler, TX 75702
Tel: (903) 590-1400
Fax: (903) 590-1436

*Counsel for Defendants*

11

**CERTIFICATE OF SERVICE**

    I hereby certify that on November 14, 2024, a true and correct copy of the foregoing document was filed electronically with the court and has been sent to all known counsel of record via the Court's electronic filing system.

                                                     */s/ James G. Gillingham*
                                                     JAMES G. GILLINGHAM
                                                     Assistant United States Attorney